**JACKSON OLDSMOBILE, INC.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. 1880.

United States District Court
M. D. Georgia,
Macon Division.

Nov. 13, 1964.

Anderson, Walker & Reichert, Macon, Ga., for plaintiff.

Edward A. Copley, Dept. of Justice, Washington, D. C., Floyd M. Buford, U. S. Atty., Macon, Ga., for defendant.

BOOTLE, Chief Judge.

Jackson Oldsmobile, Inc. brings this suit pursuant to 28 U.S.C.A. § 1346(a) (1) seeking to recover federal income taxes and interest paid for the years 1956 and 1957. The case was tried to the court without a jury and was submitted on briefs. The cause being fully considered, the court makes the following findings of fact and conclusions of law.

John Williams Buick Company (hereafter referred to as Williams) was incorporated under the laws of Delaware on December 26, 1951 and after qualifying to do business in Colorado began operating a Buick dealership in Lamar, Colorado in January of 1952. Williams' operations were financed through the Motors Holding Division of General Motors Corporation.[1] Initially the stock of Williams was acquired and owned as follows: John A. Williams acquired 114 shares of Class B non-voting stock on January 10, 1952 and on the same day General Motors (Motors Holding Division) acquired 143 shares of Class A voting stock. In addition, General Motors loaned Williams $14,300.00 on a long term, unsecured note. The stock ownership of Williams

remained as above stated until February 27, 1953, when John A. Williams acquired one additional share of Class B stock and General Motors' Class A stock was reduced by one share. John A. Williams was president of Williams until his resignation was accepted on June 26, 1953.

Williams' business consisted of selling new Buicks, used automobiles, parts and accessories, and servicing, financing and insuring automobiles. Encountering a drought and an unhealthy economic climate Williams incurred net operating losses in the years 1953 and 1954 which (after allowing for a carry-back of $9,991.91 to the taxpayer for the year 1952) totaled $28,700.75. Because of unsuccessful operations, the Board of Directors of Williams, on September 18, 1953, ordered and directed that the affairs of the company be wound up and liquidated and that John A. Williams be appointed liquidator. This action was ratified by the stockholders on November 25, 1953. In October of 1953, Williams formally notified the Internal Revenue Service of its plan of liquidation. Williams made its last sales in November, 1953, and all the financial statements from December, 1953 through September, 1955 show no operational income, sales or profits. The 1953 and 1954 income tax returns filed by Willams reflected that the corporation was "in process of liquidation." However, there were other corporate activities

---

1. When an individual has qualified for a General Motors' dealership and needs outside capital, he may acquire such capital through a plan offered by the Motors Holding Division. Under this plan a corporation is . formed and the dealership franchise is transferred to the corporation. General Motors agrees to furnish 75% of the corporation's capital and the individual is required to furnish 25%. Of General Motors' 75% of the capital one half is used to purchase Class A voting stock of the corporation and the other half is in the form of a long term unsecured loan to the corporation. The individual's 25% of the capital is used to purchase Class B non-voting stock. Once the corporation is capitalized the individual is elected president and is compensated with a small salary plus a bonus arrangement. The earned sur-

plus of the corporation is used each year in the following manner. The long term note is reduced by applying 45% of the earned surplus, and of the remaining 55% one half is used to redeem the Class A stock owned by General Motors and the other half of the remaining 55% is declared as a dividend to the stockholders. There is no restriction on the dividends paid on General Motors' Class A stock, however, the dividends paid to the individual on his Class B stock are restricted and must be used to buy 'Class A stock from General Motors, which is converted into Class B stock upon purchase. The purpose of this plan is for the corporation and individual at some time in the future to redeem all of General Motors' stock and pay the long term loan leaving the individual as the sole stockholder.

continued throughout 1954 and 1955. During 1954 and through September of 1955, there were collections of accounts receivable, payments of taxes and other expenses; arrangements were made to compromise the remaining lease obligation and the return of certain obsolete parts and inventory to General Motors. At all times during this period Williams had cash on deposit and as of August 31, 1955 had assets of $5,233.51. On February 11, 1954, John A. Williams conveyed all of his Class B stock to General Motors. Williams obtained on July 23, 1954 a certificate of withdrawal from the State of Colorado and thereafter all the corporate transactions were directed from Detroit, Michigan by General Motors, its sole stockholder. At all times Williams has had a President and Directors and on November 7, 1955 General Motors decided to continue as an investor in Williams rather than seek a dissolution thereof. This decision was conditional upon finding another dealer who would be willing to become a stockholder with General Motors in Williams.

One Leland Jackson, then of Atlanta, Georgia, learned around August of 1955 that an Oldsmobile dealership in Macon, Georgia was going out of business later that fall. Aspiring to own a dealership, Leland Jackson promptly began negotiating with the Oldsmobile dealer in Macon to lease his facilities and with the Oldsmobile Division of General Motors for the franchise in Macon. Being reasonably certain of acquiring both the franchise and the facilities in Macon, Leland Jackson went to the Motors Holding Division to arrange the financing of his prospective dealership. Agreeing to help finance Leland Jackson's prospective dealership, General Motors (Motors Holding Division), as sole stockholder, amended the charter of Williams changing its name to Jackson Oldsmobile, Inc. (hereafter referred to as Jackson) and on November 18, 1955 Jackson was qualified to conduct business in the State of Georgia. Leland Jackson testified that until approximately November 15, 1955 he had never heard of

Williams and that he had nothing to do with arranging the amendment of the corporate charter. He testified further that he had no knowledge of the Motors Holding Division's purpose in using the Williams charter rather than organizing a new corporation and that Williams was utilized without his knowledge. He stated that his sole purpose in negotiating with Motors Holding Division was to get a dealership.

The corporation was re-capitalized as follows: In November of 1955 Leland Jackson purchased 250 Shares of Class B non-voting stock for $25,000.00. To its existing holding of 142 shares of Class A voting stock, General Motors added 233 shares of Class A voting stock making a total holding of 375 in which General Motors had invested $37,500.00. General Motors also made a long term unsecured loan of $37,500.00 to Jackson. On a percentage basis General Motors owned 60% of the outstanding stock of Leland Jackson and Jackson owned 40%. The corporate stock structure remained unchanged through December 31, 1956. During 1957 there were changes in the corporate stock ownership and as of December 31, 1957 Leland Jackson owned 279 shares of Class B non-voting stock or 49.03% of the outstanding stock and General Motors owned 290 shares of Class A voting stock or 50.97% of the outstanding stock. As previously explained in footnote one, the Motors Holding Division plan requires that 45% of the earned surplus of Jackson be used to reduce the long term loan, that one half of the remaining 55% be used by Jackson to redeem General Motors Class A stock and that the other half be declared as a dividend to the stockholders. Dividends paid to General Motors on Class A stock are unrestricted, while dividends paid to Leland Jackson on his Class B stock are restricted. They must be used to purchase Class A stock from General Motors which is converted to Class B stock upon purchase. Throughout the period of time relevant to this case, ending December 31, 1957, General Motors has owned in excess of 50% of the outstanding stock of

Jackson and has had complete control of the corporation through its voting stock.

Jackson, with Leland Jackson as president, began operations in Macon, Georgia around November 17, 1955, which was approximately one year and four months after the corporate entity was withdrawn from Colorado. Jackson did not acquire any of Williams' equipment or inventory and none of the Williams salesmen and employees came to work for Jackson. In its 1955 income tax return Jackson states with respect to its operations as Williams that "new books were set up, no assets of book value or liabilities of a book nature were assumed, and therefore, no beginning balance is in the surplus account." Jackson did, however, pay the remainder of the loan which General Motors made to Williams. Jackson leased the premises of the former Oldsmobile dealer in Macon and also purchased some of his inventory of parts, furniture, fixtures and shop equipment. Primarily, Jackson's business consisted of selling new Oldsmobiles, parts and accessories, servicing automobiles, financing automobiles through General Motors Acceptance Corporation, and insuring automobiles through Motors Insurance Corporation.

In its federal income tax returns for the years 1956 and 1957, Jackson deducted the net operating losses totaling $28,700.75 incurred by Williams during 1953 and 1954. The Commissioner disallowed the deductions and issued a deficiency assessment against Jackson in the amount of $11,265.99. Subsequent to paying the deficiency, Jackson filed claims for refunds, the claims were rejected and Jackson instituted this suit to recover $11,265.99 plus interest thereon at 6 percent per annum from October 24, 1960.

■ The taxpayer, Jackson, in this case is seeking to carry over 1953 and 1954 net operating losses and deduct them from profits earned during 1956 and 1957. Inasmuch as 1953 and 1954 are the years in which the taxpayer incurred the net operating losses, there is somewhat of an overlapping of the 1939 and 1954 Codes of Internal Revenue. Accordingly, the taxpayer must initially show that section 122 of the 1939 Code permits it to deduct the 1953 loss and that section 172 of the 1954 Code permits it to deduct the 1954 loss. Furthermore, the taxpayer must show that no section of the 1954 Code prohibits or limits the deduction of these losses. The 1954 Code governs in this respect because the relevant events (other than the losses) occurred in 1955 and 1956.

Basically, the taxpayer contends in this case that sections 382(a) and 269 of the 1954 Code are the sole criteria in determining whether a corporate taxpayer will be prohibited from or limited in carrying over and deducting net operating losses in a 1954 Code year; otherwise, the loss may be "prima facie" carried over. More specifically, the taxpayer contends that section 382(a) was designed by Congress to provide an objective standard by which to determine the availability of net operating loss carryovers, and that section, together with section 269, to the exclusion of the rationale of Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), are the only limitations applicable to the operating loss carryover at issue in this case. The taxpayer has not relied entirely on the above contention and has asserted that even if the rationale of Libson Shops is applied to 1954 Code years, it is inapposite to this case.

Primarily, the Government contends that the taxpayer, Jackson, is not the taxpayer who incurred the losses and therefore should not be allowed to carry over the 1953 and 1954 losses. This contention is based on the continuity of business enterprise rationale of the Libson Shops case. Contrary to the taxpayer's contention the Government urges this court to apply Libson Shops to 1954 Code years. In addition, the Government contends that the taxpayer while it was operating under the name of Williams was dissolved in a de facto liquidation and that the losses incurred may not now be used by the taxpayer. Another

contention is that the provisions of section 269 bar the net operating loss carryover.

It is clear that neither section 382(a) nor 269 of the 1954 Code are applicable to the facts of this case. In order for section 269 to limit or prohibit the carryover of net operating losses by the taxpayer, some person or persons must have acquired control of the taxpayer for the principal purpose of evading or avoiding Federal income taxes. Control as used in section 269 means "the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation." Certainly no person or persons have acquired control of the taxpayer. General Motors was the sole stockholder of the taxpayer until November of 1955 when Leland Jackson purchased 250 shares of non-voting stock. At the same time Leland Jackson purchased his stock, General Motors also purchased 233 more shares of voting stock to go with the 142 shares it already had. Thus General Motors has had "control" of the taxpayer at all times relevant to this case. Because there has not been a change in the ownership of the taxpayer's stock of at least 50 percentage points section 382(a) does not apply.

In view of the inapplicability of sections 382(a) and 269 the court is confronted with the question whether the Libson Shops doctrine should be applied in determining whether a net operating loss of pre-1954 Code years may be deducted under the 1954 Code, and if it is, whether that doctrine prohibits the taxpayer from deducting the carryover losses in this case. As previously stated, the taxpayer contends that the 1954 Code provides an objective standard in section 382(a), together with section 269, governing the availability of a net operating loss carryover and that if this objective standard is complied with the loss may be carried over regardless of the Libson Shops case. The Government's position is that although a taxpayer may have

satisfied sections 382(a) and 269, it must still show that it has not violated the Libson Shops doctrine. Several courts have now applied the Libson Shops doctrine to 1954 Code years where a taxpayer has sought to carry forward pre-1954 losses. See J. G. Dudley v. Commissioner, 298 F.2d 750, 755 (4th Cir.1962); Huyler's v. C.I.R., 327 F.2d 767, 773 (7th Cir.1964); Beckett v. Commissioner, 41 T.C. 386; Gulf Realty and Insurance Co. v. Tomlinson, 11 AFTR2d 465. These authorities are quite persuasive. We are of the opinion, however, that the Libson Shops doctrine, even if applicable, does not prohibit the taxpayer in this case from deducting the 1953 and 1954 losses.

In Libson Shops there were 17 corporations which were all under common control and filing separate income tax returns. Sixteen of them, which were each operating a clothing store, merged into the 17th which had been engaged in providing a management service for the other 16 corporations. At the time of the merger three of the constituent corporations had net operating losses. In its income tax return for the year following the merger the surviving corporation sought, under section 122 of the 1939 Code, deductions for the net operating losses of the three constituent corporations. After the merger the stores were operated as retail units of the surviving corporation and the same three stores continued to have losses. The District Court and the Court of Appeals, 8 Cir., 229 F.2d 220, denied the carryover of the pre-merger losses against post-merger profits, on the ground that the corporation surviving the merger was not the same taxpayer as the corporations which had sustained the losses. The Supreme Court affirmed the holding of the lower courts, and likewise said that the controversy centered on the meaning of the word "taxpayer" appearing in section 122 of the 1939 Code, and that "The contentions of the parties require us to decide whether it can be said that petitioner, a combination of 16 sales businesses, is 'the taxpayer' having the pre-merger losses of three of those businesses." In deciding

this question, however, the Court relied on a theory of business continuity which it considered dispositive of the case, saying "The Government contends that the carry-over privilege is not available unless there is a continuity of business enterprise. It argues that the prior year's loss can be offset against the current year's income only to the extent that this income is derived from the operation of substantially the same business which produced the loss. Only to that extent is the same 'taxpayer' involved." The Court concluded "that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." Libson Shops emphasizes the carryover statute must be interpreted as requiring the income against which an offset is claimed to be produced by substantially the same business as that which incurred the loss.

Although Libson Shops is not a binding precedent when the legal entity of the taxpayer is unchanged as in the case at bar and the Court itself purported to reserve decision in a case like ours,[2] the Libson Shops rationale has been applied to disallow a carryover where a single corporate taxpayer discontinued the business to which a loss was attributable and undertook a new and profitable business. See Mill Ridge Coal Company v. Patterson, 264 F.2d 713, 717 (5th Cir.1959); Willingham v. United States, 289 F.2d 283, 286 (5th Cir.1961); J.G. Dudley Company v. C.I.R., 298 F.2d 750 (4th Cir. 1962); C.I.R. v. Virginia Metal Products, Inc., 290 F.2d 675 (3d Cir.1961); Norden-Ketay Corporation v. C.I.R., 319 F. 2d 902 (2d Cir.1963). In each of the cases, however, there was a complete or almost complete change in the ownership of the corporation's stock and the corporation after the change in stock ownership conducted an entirely new and different business from that previously conducted. In other words, in these cases there was no continuity of business and there was no continuity of ownership, although there was the same corporate entity.

In Mill Ridge Coal Company v. Patterson, supra, for instance, the corporate taxpayer was in the business of operating a coal mine which incurred a net loss for several years. Thereafter all of the physical assets of the corporation were sold and, for approximately one year the corporation conducted no business. Later all of the corporation's stock was purchased by third parties who used the taxpayer corporation, rather than another corporation they had just organized, for the purpose of conducting a profitable oil transporation business. The corporation deducted the losses of the coal business from the profits of the oil transportation business but the court denied the deduction holding under the Libson Shops case that the taxpayer claiming the deduction was not the same taxpayer as had sustained the loss. The court also held that the corporate taxpayer had been purchased for the principal purpose of avoiding taxes and therefore the deduction was prohibited by section 129(a) of the 1939 Code. It is important to note that the facts of Mill Ridge and the other cases above cited are almost identical to the pre-Libson Shops cases of Alprosa Watch Corp. v. Commissioner, supra, and A. B. & Container Corp. v. Commissioner, supra, cited in footnote 9 in the Libson Shops case, which cases had held that the losses of a discontinued business of a corporate taxpayer which had undergone an entire change in stock ownership could be carried forward against the income of a new business where the corporate entity remained the same. In the Alprosa case,

2. The Supreme Court, in a now famous footnote 9, stated: "We do not pass on situations like those presented in Northway Securities Co. v. Commissioner, 23 B.T.A. 532; Alprosa Watch Corp. v. Commissioner, 11 T.C. 240; A. B. & Container Corp. v. Commissioner, 14 T.C. 842; W A G E, Inc. v. Commissioner, 19 T.C. 249. In these cases a *single* corporate taxpayer changed the character of its business and the taxable income of one of its enterprises was reduced by the deductions or credits of another." This simply was an attempt by the court to confine its decision to the facts.

for instance, there was a radical change in the ownership of the corporate taxpayer's stock and the character of its business was completely changed, but the corporate entity was not changed.

▆▆▆ These post-Libson Shops cases clearly establish that where a corporation has undergone a complete change in its stockholders and subsequent to the change in stockholders the corporation undertakes a different type of business enterprise from that previously conducted the corporation will not be allowed to carry over net operating losses attributable to the old business although the corporate entity continues. We think these cases leave open, however, the question of what the result should be when there has been a continuity of at least a majority stock ownership in a corporation and it has continued essentially the same type business, although it has liquidated its assets, remained relatively inactive for a period of time, has been recapitalized, has changed its name and has relocated. In the Norden-Ketay Corporation case, supra, it is suggested that where there is a continuity of ownership, there might be justice in allowing a loss carryover even though there has been a complete change in the nature of the corporate activity. The purposes of the carryover statute being ultimately to grant a legitimate tax advantage to the shareholders behind the corporate entity, the court's suggestion in the Norden-Ketay Corporation case seems sound. See Newmarket Manufacturing Co. v. United States, 233 F.2d 493 (1st Cir. 1956). Stockholders who sustain a loss and then are wise enough to abandon an uneconomic enterprise and set out on a different and profitable business through the same corporation are equally entitled to offset the earlier losses as those who see an unprofitable corporation through the lean years into the good ones in the same activity. See Northway Securities Co. v. Commissioner, 23 B.T.A. 532.

Kolker Bros., Inc. v. Commissioner, 35 T.C. 299, is a case of interest. There the corporate taxpayer was in the business of operating a retail liquor and grocery business. Its president was the majority stockholder and he was also minority stockholder in another corporation which operated a hotel supply business consisting of furnishing meats and meat products and food to hotels, restaurants, institutions and home freezers. The taxpayer decided to purchase the assets of the corporation operating the hotel supply business and in order to do this the taxpayer had to borrow money from outside sources. As a means of cancelling the loan, the taxpayer issued 220 shares of stock to the persons who had loaned the money. These persons acquired about 46 percent of the outstanding stock of the taxpayer. After acquiring the hotel supply business the taxpayer continued to operate it profitably and also continued to operate its own retail liquor and grocery business for a little more than 6 months at a loss. It was then transferred to a third party. From the profits made on the hotel supply business the taxpayer deducted the losses suffered in the retail liquor and grocery business. This deduction was disallowed by the Commissioner on the ground that "the income against which the losses are claimed as an offset was not produced by substantially the same business which incurred the losses," citing as authority the Libson Shops and Mill Ridge cases. Finding that the majority stockholder of the taxpayer purchased the assets of the hotel supply business for legitimate business purposes, the court held that section 129 of the 1939 Code did not apply. The court distinguished the cases relied on by the Commissioner as follows:

"(1) In the instant case 'a single corporate taxpayer changed the character of its business' but did not change the essential nature of its business * * *, (2) there was here 'a continuity of business enterprise', with the same taxpayer by its own operations earning the income and sustaining the losses involved, (3)

petitioner acquired the assets of Washington Beef for a bona fide business purpose and there was no aim or purpose motivating the transaction here to obtain a tax 'windfall' or to accomplish indirectly what is prohibited by section 129, and (4) the income against which the offset is claimed was produced by substantially the same business which produced the losses since both the income and the losses resulted from the retail sales of food and provisions made by petitioner corporation even though the income was derived not from the retail sales of all types of food products and beverages to the general public, but from a more restricted and intensified specialization in that general business involving the sale of one principal type of food to a limited class of customers."

The court concluded that the taxpayer was entitled to the net operating loss carryover. About the only difference between the case at bar and the Kolker case is that in Kolker there was no break in the conduct of corporate activities, whereas in the case at bar the taxpayer was in a state of liquidation and was relatively inactive for a period of time.

The Internal Revenue Service has announced its non-acquiescence in the Kolker case and the case seems to be in conflict with Revenue Ruling 63–40. In this Ruling the Service announced that where there has been no change in the stock ownership of a corporation during or after a period in which it incurred losses, it will not rely on the rationale of Libson Shops to bar the corporation from carrying over the losses under section 172 of the 1954 Code against income from a new business enterprise, acquired through a cash purchase of assets at their fair market value, solely because the losses are attributable to a discontinued business. The Ruling says further that where there is more than a

minor change in stock ownership of a loss corporation which acquires a new business enterprise, the Service may continue to contest the deductibility of the carryover of the corporation's prior losses against income of the new business enterprise. Clearly the 46 percent change in the stockholders in the Kolker case is more than a minor change in stock ownership. The Service cites in support of this latter position such cases as Mill Ridge, supra; Willingham v. United States, supra; C.I.R. v. Virginia Metal Products, Inc., supra; J. G. Dudley Co., Inc. v. C.I.R., supra. As previously pointed out, there was in these cases a complete or almost complete change in the ownership of the corporations' stock and a complete change in the type business conducted by the corporations.

Applying these principles to the case at bar we see there has been continuity of majority stock ownership. There has not been the complete change in stockholders as there was in the Mill Ridge case. There has been a substitution of one minor stockholder for another. Neither of these stockholders ever owned as much as 50 percent of the outstanding stock. When Leland Jackson bought 250 shares of the taxpayer's stock in November of 1955, he owned only 40 percent of the outstanding stock. Moreover, both of the minor stockholders owned non-voting stock and consequently the majority stockholder, General Motors, who owned the voting stock had control of the taxpayer. The taxpayer has not changed the character of its business to a distinctly new and different endeavor as happened in the Mill Ridge case. Essentially the taxpayer is conducting the same business in Macon, Georgia it conducted in Lamar, Colorado. Of course, there are minor differences. The taxpayer now sells Oldsmobile automobiles, whereas in Colorado it sold Buicks. It has different employees than it had in Colorado, and it has changed its name from Williams to Jackson. In Libson Shops the Court left some room for

changes in the business of a taxpayer when it said "the income against which the offset is claimed was not produced by substantially the same business which incurred the losses." We cannot say in this case that the taxpayer is not conducting substantially the same business in Macon, Georgia it conducted in Lamar, Colorado. Little, if any, significance is to be attached to the change of corporate domicile. Newmarket Manufacturing Company v. United States, supra.

■ We cannot agree with the Government's contention that the taxpayer should be regarded as having undergone a de facto liquidation. Impressed with the view as expressed in Norden-Ketay Corporation, supra, 319 F.2d at 906 that "shareholders who sustain a loss and then are wise enough to liquidate an uneconomic enterprise and embark on a different and profitable field of endeavor through the same corporation are equally entitled to offset the earlier losses as those who see an unprofitable corporation through the lean years into the good ones in the same activity," we think that such shareholders are entitled to a reasonable length of time in which to accomplish the liquidation of the uneconomic enterprise and the embarkation on a different and profitable field of endeavor. We think too that the period of relative inactivity of this taxpayer was not excessive for these permissible purposes. Moreover, the Tax Court has refused to apply the de facto liquidation rule established in Wier Long Leaf Lumber Co. v. Commissioner, 173 F.2d 549 (5th Cir.1949), to net operating loss cases. See Gorman Lumber Sales Co. v. Commissioner, 12 T.C. 1184; Acampo Winery & Distilleries, Inc. v. Commissioner, 7 T.C. 629.

Accordingly, we conclude that the taxpayer is entitled to prevail and its counsel may prepare and submit an appropriate judgment in accordance with these findings and conclusions.