**MERIDAN CORPORATION, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 63 Civ. 2036.**

United States District Court
S. D. New York.

March 22, 1966.

Coudert Brothers, New York City, for plaintiff, Joseph A. McManus, Emilio A. Dominianni, Stanley R. Raskin, William D. Maroney, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defendant, Harvey R. Blau, Asst. U. S. Atty., of counsel.

LEVET, District Judge.

In this tax refund action, plaintiff, Meridan Corporation (hereinafter "Meridan") seeks to recover $111,516.10 plus interest which it paid pursuant to a corporate income tax deficiency determined by the Commissioner of Internal Revenue for the year 1955. The taxpayer's claim is that certain net operating loss carryovers from 1950 and 1953 against its 1955 income were erroneously disallowed by the Commissioner. Under the special transitional rules of Section 172(g), Internal Revenue Code of 1954, this claim must be determined under the net operating loss carryover provisions of the Internal Revenue Code of 1939.[1]

After hearing testimony of the parties, examining the exhibits, the pleadings, the briefs and proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The plaintiff, Meridan, was formerly known as the Flax Processing & Linen Company (hereinafter "Flax"). Flax was a corporation organized in 1940 under the laws of Rhode Island. Flex-O-Tube Company (hereinafter "Flex-O-Tube") was an Illinois corporation, organized in 1945. On October 31, 1951, Flax and Flex-O-Tube were merged into Flax, the Rhode Island corporation, above named, and the name of the surviving corporation was changed to "Meridan Corporation."

2. The plaintiff, Meridan, is presently a corporation organized under the laws of Washington with its principal place of business at 200 Park Avenue, New York, New York. This results from the fact that in September, 1961, "Meridan," the Rhode Island corporation into which Flex-O-Tube had been merged, and United Power Control Corporation, a Washington corporation, were merged into United Power Control Corporation, the name of which surviving corporation was thereafter changed to Meridan Corporation.

3. From its inception until October 31, 1951, Flax was wholly owned by one Werner Abegg.

4. Between 1941 and 1947, Flax was engaged in spinning and weaving operations at Greystone, Rhode Island.

5. In November, 1947, Flax ceased all spinning and weaving operations at its plant in Greystone, Rhode Island. It reduced its staff to a few employees whose sole function was to maintain the machinery. The machinery and equipment were maintained in good operating condition and kept repaired by Flax employees from 1947 to May of 1953.

6. After the cessation of operations at the Greystone plant, Flax had on hand certain fabric and yarn inventory.

7. The fabric inventory was sold off by the end of 1950.

8. The yarn inventory consisted of linen yarn, containing 27% hemp and showing signs of mildew, which was not readily salable. It was converted into linen towels at a plant of the Meredith Linen Mills in Meredith, New Hampshire, which Flax leased. By May, 1950, all the yarn inventory had been converted.

---

1. Accordingly, the specific provisions on the availability of loss carryovers under Sections 381 and 382, Internal Revenue Code of 1954, are not applicable.

9. During the years 1949 and 1950, Flax conducted a mail order business under the trade name, "Irish Maid Linens" at Greystone. This business consisted of cutting, sewing, and selling the towels made in Meredith, New Hampshire. Selling of linen towels continued through June, 1953, when the towel inventory was exhausted.

10. Subsequent to 1947, aside from liquidating fabric inventory, converting yarn inventory into salable towels, and liquidating the towel inventory, Flax' activity was limited to attempts by management to sell the machinery, equipment, and buildings at Greystone, Rhode Island. Also, it appears that Flax' management was alternatively interested in finding a suitable business partner with whom diversification and expansion of operations would be possible.

11. From 1947 through 1951 and thereafter, Flax, through its officers and agents, continuously attempted to sell off the machinery, equipment, buildings and land located in Greystone, Rhode Island.

12. In 1950, Flax sold its buildings and land at Greystone, Rhode Island, and the machinery and equipment was stored there rent free at the discretion of the new owner.

13. Between 1947 and 1950, Flax, through its officers and agents, contacted over 100 different companies in the textile business in trying to sell its machinery and equipment, but Flax never received a single offer from a prospective buyer for such machinery and equipment.

14. In its efforts to sell its machinery and equipment, in December, 1950, Flax engaged the firm of Lockwood Greene Engineers, Inc. of Boston, Massachusetts to appraise the condition of Flax' machinery and equipment in Storage at Greystone, Rhode Island.

15. In December, 1950, Flax also engaged H. R. Carter & Son, Ltd. of Belfast, Ireland as its exclusive world-wide selling agent for the machinery and equipment.

16. As of October 31, 1951, Flax had sustained a loss in every period of its operations, except the period January 1 to October 31, 1951, and had accumulated losses from operations of $2,631,496.42.

17. At October 31, 1951, Flax' machinery and equipment had a book value of a little over $600,000. Mr. Thomas O. Ott, a consulting textile engineer, testified that the equipment had a fair value of around $600,000 on October 31, 1951; however, in forming his opinion, Ott did not take into account either the exact amount of the losses sustained by Flax or the fact that Flax had never received an offer for its machinery in the 1947–1951 period. Furthermore, the $600,000 figure set forth by Ott was an offering price, and not necessarily the price that a willing buyer would pay. Obviously, this is not a proper method of evaluation.

18. On October 31, 1951, there was no readily ascertainable market for Flax' machinery and equipment. The most that Flax could hope for was that a buyer would appear in the future. In 1951 there was no certainty that such a buyer would appear, and Meridan has failed to prove that the appearance of a future buyer was even likely.

19. In 1953, Flax' machinery and equipment was sold for $52,346.22.

20. I find that on October 31, 1951 the machinery and equipment of Flax was of very limited value since there appears to have been neither a market nor the prospect of a market for it. I find further that any loss on that machinery was economically realized before October 31, 1951.

21. In early 1951 negotiations concerning a possible merger were commenced by Robert Cavin, President of Flax, with the owners of Flex-O-Tube.

22. Flex-O-Tube was an Illinois corporation organized in 1945 and engaged in the flexible hose and coupling business.

23. Flex-O-Tube at all times prior to October 31, 1951 was a profit-making corporation with no operating losses or operating loss carryovers.

24. Negotiations concerning the proposed merger of Flax and Flex-O-Tube continued during the spring and summer

of 1951. Meetings were held, and at those meetings the net operating loss of Flax was specifically discussed. It was stated during the negotiations by one or more of the parties that Flax, the company with the operating losses, had to be the surviving company in the merger in order to take advantage of its net operating loss carryovers.

25. On October 31, 1951, Flex-O-Tube was merged into Flax, and the name of the surviving corporation was changed to Meridan Corporation, the plaintiff herein.

26. Werner Abegg, prior to the merger the sole owner of Flax, became the 51% owner of the surviving company, and the owners of Flex-O-Tube became 49% owners of Meridan.

27. To facilitate the merger, Werner Abegg guaranteed in effect that Flax would contribute assets worth at least $500,000 to the merged company. Under a separate agreement between Abegg, Flax and Flex-O-Tube, Abegg agreed, in consideration of the consummation of the merger, that he would pay the surviving corporation, Meridan, an amount to be computed as provided in the agreement in the event that the disposition of Flax' assets did not produce an aggregate amount of $500,000. To collateralize this agreement, Abegg lent Meridan $400,000 and received a promissory note in return. In 1953, Abegg's guarantee was enforced. Since the proceeds from the disposition of Flax' assets yielded only $122,601.26, Abegg was obliged to pay Meridan $377,-398.74 which was satisfied when he surrendered Meridan's $400,000 note in exchange for a check of $22,601.26.

28. After the merger, Meridan continued the operation of the Flex-O-Tube business and continued to attempt to sell Flax' machinery and equipment. It is also asserted by Meridan that it was alternatively attempting to find a suitable operating partner for the Flax business, but I find that no such attempt in fact took place.

29. At the time of the merger, Flax had no genuine intention of returning to the textile business and was merely liquidating its inventory and attempting to sell its machinery.

30. Subsequent to the merger, in 1953, the machinery and equipment of Flax was sold for $52,346.22 for a book loss of $530,524.73, which created an operating loss for Meridan in the year 1953 of $309,445.23.

31. Meridan's 1955 Federal income tax return claimed, inter alia, net operating loss deductions of $161,864.69 for the pre-merger year of 1950 and $309,-445.23 for the post-merger year of 1953.

32. Meridan's 1955 income was derived from sources other than the Flax business.

33. I find that the principal purpose of Flax' acquisition of Flex-O-Tube was avoidance of Federal income taxes by securing the benefit of a deduction which it would not otherwise enjoy.

## DISCUSSION

■■ The initial question raised in this case is the applicability of Section 129(a), Internal Revenue Code of 1939, which provides in pertinent part:

"§ 129. Acquisitions made to evade or avoid income or excess profits tax

"(a) Disallowance of deduction, credit, or allowance. If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For the purposes of clauses (1) and (2), control means the ownership of stock possessing at least 50 per centum of the total combined voting power of all classes of stock entitled to vote or at least 50 per centum of the total value of shares of all classes of stock of the corporation."

Neither the pre-merger 1950 net operating loss of Flax nor the post-merger 1953 net operating loss which I have found was built in and economically realized before the 1951 merger may be allowed if the principal purpose of the merger of Flax and Flex-O-Tube into Meridan had as its principal purpose the evasion or avoidance of Federal income tax by securing a deduction which would not otherwise be enjoyed. Luke v. Commissioner, 351 F.2d 568 (7th Cir. 1965); J. T. Slocomb Company v. Commissioner, 334 F.2d 269 (2nd Cir. 1964); R. P. Collins & Co. v. United States, 303 F.2d 142 (1st Cir. 1962). Whether tax avoidance is the principal purpose of an acquisition is a question of fact on which the taxpayer has the burden of proof. American Pipe & Steel Corp. v. Commissioner, 243 F.2d 125 (9th Cir.), cert. denied 355 U.S. 906, 78 S.Ct. 333, 2 L. Ed.2d 261 (1957). Tax avoidance need not be the sole purpose of the acquisition; the statute requires only that it be the principal purpose. J. T. Slocomb Company v. Commissioner, supra.

■ Examination of the evidence in this case convinces me that the plaintiff Meridan has failed to prove that tax avoidance was not the principal purpose of Flax' acquisition of Flex-O-Tube. The taxpayer asserts that the principal purposes of the merger were business purposes, namely (1) to provide working capital for Flex-O-Tube, (2) to engage in the business of manufacturing flexible coupling and hose, (3) to secure a suitable operating arrangement for the linen business or sell the Flax machinery as a unit, and (4) to develop the merged enterprise into a large diversified enterprise. The evidence reveals, however, that in 1951 Flax was in the process of liquidating its inventory and machinery and had operating losses which it could never hope to deduct against income. By merging with Flex-O-Tube, it was hoped that those losses might be utilized; in fact, the evidence is clear that Flax was made the successor corporation for the express purpose of attempting to secure the benefit of Flax' losses. In my opinion, the principal purpose of the merger here was tax avoidance, and I so find. That there may have been some business purposes incidental to the merger does not negative the existence of a tax avoidance purpose since it is clear that tax avoidance can be the principal purpose of an acquisition even where a valid business purpose for the transaction is present. Luke v. Commissioner, supra; J. T. Slocomb Company v. Commissioner, supra.

Meridan's reliance on the principle that a taxpayer may arrange his affairs so as to minimize his tax liability by means which the law permits is misplaced, since here the law in Section 129, Internal Revenue Code of 1939, specifically disallows a deduction where the taxpayer's principal purpose in arranging his affairs is tax avoidance.

■■ Even if tax avoidance were not the principal purpose of the merger here, the taxpayer would still not be entitled to the net operating loss carryovers from either 1950 or 1953 under Section 122 (b) (2), Internal Revenue Code of 1939. Under the doctrine of Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), net operating loss carryovers can be used against a current year's income "only to the extent that this income is derived from the operation of substantially the same business which produced the loss." Id. at 386, 77 S.Ct. at 993. The taxpayer, relying on Rev. Rul. 63–40, 1963–1 Cum.Bull. 46 and Norden-Ketay Corp. v. Commissioner, 319 F.2d 902 (2nd Cir.), cert. denied 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963), asserts that the Libson Shops doctrine is inapplicable to the present case since a continuity of ownership is present in that Werner Abegg owned 100% of Flax before the merger and 51% of Meridan after the merger. Those authorities stand for no more than the proposition that net operating loss carryovers will be allowed in spite of a change in business enterprise when there is no substantial change in ownership. Here such a change in ownership took place; Abegg reduced his holdings in Flax from 100% to 51%, and the owners of Flex-O-

Tube held 49% of Flax after the merger. See Julius Garfinckel & Co., Inc. v. Commissioner, 335 F.2d 744 (2nd Cir. 1964), cert. denied 379 U.S. 962, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965); Huyler's v. Commissioner, 327 F.2d 767 (7th Cir. 1964). But see Jackson Oldsmobile, Inc. v. United States, 237 F.Supp. 779 (M.D. Ga.1964); Kolker Bros., Inc., 35 T.C. 299 (1960).

The taxpayer also asserts that the Libson Shops doctrine is not applicable here since the present case lacks the element of choice and subsequent repudiation of that choice found in Libson Shops, Inc. v. Koehler, supra. The Supreme Court stated in Libson Shops:

"* * * In the present case, the 16 sales corporations, prior to the merger, chose to file separate income tax returns rather than to pool their income and losses by filing a consolidated return. Petitioner is attempting to carry over the pre-merger losses of three business units which continued to have losses after the merger. Had there been no merger, these businesses would have had no opportunity to carry over their losses. If petitioner is permitted to take a carry-over, the 16 sales businesses have acquired by merger an opportunity that they elected to forego when they chose not to file a consolidated return." 353 U.S. at 388, 77 S.Ct. at 994.

This observation, that the 16 corporations could have filed consolidated returns, was erroneous, see Surrey & Warren, Federal Income Taxation, 1586 (1960), but the taxpayer argues that it shows the thinking of the Court and the importance of the element of choice. In this case, the taxpayer asserts that there was no choice since Werner Abegg as the sole owner of Flax could not have arranged his affairs differently before the merger in order to utilize Flax' losses against Flex-O-Tube's income. The taxpayer's assertion does not persuade me since it appears to me that the basic rationale of Libson Shops is to be found in the principle that loss carryovers are to be denied where the income against

which an offset is claimed was not produced by substantially the same business which incurred the losses, and not in any "choice" factor.

To my mind, this is a proper case for the application of the Libson Shops doctrine since the taxpayer, Meridan, is seeking to offset the post-merger income of the Flex-O-Tube business with the pre-merger operating and built-in losses of its predecessor, Flax. Accordingly, the loss carryovers from 1950 and 1953 against Meridan's 1955 income were properly disallowed by the Commissioner.

I am unimpressed with the argument that the loss carryover from 1953 was improperly denied since that loss occurred after the merger. While it is true that courts have allowed post-merger operating losses of the loss company to be carried forward against post-merger income of the profit company, Zanesville Investment Co. v. Commissioner, 335 F.2d 507 (6th Cir. 1964), such carryover is improper where the post-merger losses of the loss company were in fact economically realized before the merger as in the present case. Cf. R. P. Collins & Co. v. United States, supra. To allow pre-merger built-in losses of the loss company to be utilized against post-merger income of the profit company solely because those losses are realized for tax purposes after the merger would be to subvert the rationale of Libson Shops, that losses may be utilized only by substantially the same business as incurred them.

The other defense raised by the United States to the taxpayer's claim for refund need not be discussed.

## CONCLUSIONS OF LAW

1. Jurisdiction is conferred on this court by 28 U.S.C. § 1346(a) (1).

2. Plaintiff has failed to prove that the principal purpose of Flax' acquisition of Flex-O-Tube was not the avoidance of Federal income taxes by securing the benefit of a deduction which it would not otherwise enjoy.

3. Under Section 129, Internal Revenue Code of 1939, plaintiff is not entitled to carry forward the losses sustained in 1950 and 1953 against its 1955 income.

4. The profits earned by plaintiff in 1955 were not derived from the same business that realized the losses in 1950 and 1953, and, therefore, under the doctrine of Libson Shops, Inc. v. Koehler, supra, plaintiff cannot utilize those losses.

5. The United States is entitled to a judgment dismissing the complaint with costs.