H. F. RAMSEY COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3349-62. Filed January 28, 1965.

*R. Glenn Snipes* and *Harold K. Bennett*, for the petitioner.
*Wallace E. Whitmore*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's income tax for the taxable years 1958 and 1959 in the respective amounts of $34,416.70 and $16,127.37.

The only issue for decision is whether petitioner, all of whose issued and outstanding stock was acquired by Baxter H. Taylor and Sam H. Bushnell in December 1957, is entitled to net operating loss deductions in 1958 and 1959 comprised of net operating loss carryovers from years prior to 1957.

There is no real dispute between the parties with respect to the evidentiary facts important to a decision of this issue, except for the testimony of witnesses interpreting those facts and reciting their reasons for entering into the principal transaction involved, so we will

not state in detail herein many of the evidentiary facts upon which we base our findings and conclusions. Our findings of fact below represent in some instances our conclusions drawn from the evidentiary facts.

FINDINGS OF FACT

The stipulated facts are found accordingly.

Petitioner is a corporation incorporated under the laws of North Carolina on September 20, 1951, engaged in the construction business, principally in the excavation of rock incident to road construction. Its principal office is in Asheville, N.C. It filed Federal corporation income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue, Greensboro, N.C.

From September 20, 1951, through December 9, 1957, H. F. Ramsey (hereafter referred to as Ramsey) owned, directly or indirectly, a majority of the issued and outstanding stock of petitioner. During this period Ramsey served as petitioner's chief executive officer. H. C. Browning (hereafter referred to as Browning) has been a director and secretary-treasurer of petitioner from 1951 to date. On December 9, 1957, petitioner's outstanding stock was owned as follows:

| Stockholder | Number of Shares |
|---|---|
| Ramsey | 1,675 |
| Browning | 105 |
| M. G. Ramsey | 70 |

Asheville Contracting Co. (hereafter called Asheville) is a corporation incorporated under the laws of North Carolina, engaged in the road construction business. Prior to his death in 1950, W. H. Anderson (hereinafter called Anderson) was its principal officer and stockholder. Ramsey, a nephew of Anderson, was a director and vice president and fulltime employee of Asheville prior to 1950. Baxter H. Taylor (hereafter called Taylor) was a son-in-law of Anderson and was employed by Asheville for the periods January 1941 to May 1942, and November 1945 to December 1948. M. G. Ramsey, also a nephew of Anderson, was employed as a foreman by Asheville continuously for more than 20 years prior to Anderson's death.

Browning became employed by Asheville in March 1946 as its office manager and chief accounting officer and continued in this employment until the incorporation of petitioner in 1951. On April 29, 1957, Browning was reemployed by Asheville as chief accounting officer and comptroller, which positions he still holds.

In his will, Anderson provided that on his death any interest he had in any contracting business should be disposed of by his execu-

tors and that such interests should first be offered for sale to his children, their husbands, and trusted employees of the business.

Immediately following Anderson's death in 1950, Asheville began curtailing its business activities. Ramsey purchased some of the equipment of Asheville and he and others formed petitioner. Taylor began the operation of a contracting business as a sole proprietorship, doing business as Taylor Construction Co., in July 1950.

In 1954 Taylor acquired all of the outstanding stock of Asheville, and in 1955 transferred to it the assets and business of his sole proprietorship. Since that time he has owned a majority of the stock of Asheville. From 1955 to the present Asheville has engaged in road construction work, including the excavation of rock. When Taylor purchased all of the stock of Asheville, it had net operating loss carryovers totaling $74,286.03 which were used as deductions to reduce the taxable income of Asheville for 1955.

Throughout the period from petitioner's formation to 1956 petitioner and Asheville were closely associated, and petitioner was also closely associated with Taylor's sole proprietorship business. Their offices were adjoining in the same building which was owned by the estate of Anderson. From time to time petitioner performed subcontract work for Taylor Construction Co. and Asheville. During the period prior to 1956 petitioner and Asheville were engaged generally in the same type of business, were about the same size, and operated in the same general area.

Petitioner's operations were not successful and net operating losses were sustained in each of the years 1951 through 1956 as follows:

| Taxable year | Net operating loss |
|---|---|
| 1951 | $6, 753. 23 |
| 1952 | 322. 64 |
| 1953 | 15, 308. 40 |
| 1954 | 77, 305. 06 |
| 1955 | 49, 411. 32 |
| 1956 | 98, 726. 17 |
| Total | 247, 826. 82 |

Up to December 9, 1957, petitioner had performed a total of 20 contracts for which it received gross income, as reported in its Federal income tax returns for the taxable years 1951 through 1957, in the total amount of $4,507,075.54. Four of these contracts were performed by petitioner as a subcontractor for Taylor Construction Co. or Asheville for a total gross amount of $741,172.78. The following is a summary of the 20 contracts:

| Date of contract | Contract No. | Location | Year completed [1] | Gross income |
|---|---|---|---|---|
| Feb. 25, 1955 | S-2407-(3)_____ | Knox County, Tenn_____ | Dec. 1955 | $32,998.79 |
| Nov. 15, 1954 | S-2522-(1)_____ | Hamblen County, Tenn_____ | Sept. 1955 | 80,610.10 |
| Apr. 15, 1954 | S-2379-(2)_____ | Carter County, Tenn_____ | Apr. 1955 | 162,381.51 |
| Sept. 14, 1953 | S-2455-(1)_____ | Unicoi County, Tenn_____ | Dec. 1954 | 378,051.69 |
| Apr. 4, 1952 | F-001-9-(18)_____ | Sullivan County, Tenn_____ | Nov. 1953 | 293,769.40 |
| July 1, 1956 | 8183 [2]_____ | Burke County, N.C_____ | Apr. 1957 | 35,420.12 |
| Feb. 29, 1952 | 8182 [2]_____ | _____do_____ | Sept. 1957 | 115,243.61 |
| Apr. 29, 1955 | 4154_____ | Durham County, N.C_____ | July 1957 | 148,880.82 |
| Mar. 4, 1955 | 8-452 [2]_____ | Watauga County, N.C_____ | July 1957 | 422,640.21 |
| Sept. 27, 1954 | 5926_____ | Rockingham County, N.C_____ | Jan. 1957 | 203,154.77 |
| Apr. 15, 1954 | 0-100_____ | Avery County, N.C_____ | Mar. 1957 | 254,456.86 |
| Jan. 6, 1954 | 0-550_____ | Madison County, N.C_____ | Dec. 1955 | 300,958.23 |
| Mar. 10, 1954 | 4156_____ | Durham County, N.C_____ | Apr. 1957 | 141,151.82 |
| Oct. 29, 1955 | 4175_____ | _____do_____ | Apr. 1956 | 182,555.02 |
| Dec. 5, 1952 | 9701_____ | Yancey-Madison Counties, N.C_____ | July 1955 | 338,260.18 |
| Sept. 15, 1952 | 8041_____ | Avery County, N.C_____ | Mar. 1954 | 118,328.03 |
| Oct. 13, 1952 | 8055_____ | _____do_____ | Mar. 1955 | 189,211.38 |
| Oct. 15, 1952 | 5009_____ | Guilford-Alamance Counties, N.C.____ | Apr. 1955 | 348,597.43 |
| Feb. 29, 1952 | 8182_____ | Burke County, N.C_____ | Apr. 1955 | 592,536.73 |
| Sept. 26, 1951 | 8035 [2]_____ | Avery County, N.C_____ | Oct. 1953 | 167,868.84 |
| Total gross income 1951 through 1957 from contracts_____ | | | | 4,507,075.54 |
| Total income from prime contracts_____ | | | | 3,765,902.76 |
| Total income from subcontracts_____ | | | | 741,172.78 |

[1] "Year completed" means the date on which final payment was received.
[2] Subcontracts for Taylor Construction Co. and Asheville.

Petitioner's losses resulted, in part at least, from the fact that Ramsey was suffering from arthritis and was otherwise in ill health starting about 1954 and could not properly supervise the contracts undertaken by petitioner.

Throughout the period of Ramsey's control of petitioner, Travelers Indemnity Co. (hereafter referred to as Travelers) provided the necessary performance bonds for petitioner's contracts summarized above. Ramsey, who had a sizable personal estate, was often called upon to personally indemnify Travelers from any loss on these bonds. In May 1956 petitioner informed Travelers that it was unable to pay outstanding debts for materials, supplies, and labor furnished petitioner in the course of performing its contracts, and that it was unable to obtain funds to complete its contracts without financial assistance. After consultation with representatives of Travelers, petitioner and Travelers entered into an agreement dated May 25, 1956, denominated a trust agreement, in which, after reciting that Travelers, as surety, had executed performance bonds in connection with contracts Nos. 4175, 4156, 0-100, 5926, and 4154, described above, it was agreed that Travelers might advance funds to petitioner to make performance of the contracts possible.

In the agreement, petitioner and Travelers agreed to open and maintain a special bank account at a bank to be chosen by Travelers and that any funds received with respect to the contracts (either by petitioner or by Travelers as petitioner's assignee) would be deposited in the account, together with any advances from Travelers and the proceeds

of any loans negotiated by petitioner to pay the costs of the contracts. Any checks drawn on the account were to be jointly signed by Ramsey and Browning and approved by designated persons. The account was to be maintained for the purpose of paying the costs of completing the contracts, repaying any advances by Travelers, and indemnifying Travelers with respect to its liabilities as surety on the performance bonds. Any funds in the account were to be impressed with a trust. Upon completion and acceptance of the contracts and discharge of all obligations guaranteed by Travelers and of all costs incurred in performance of the contracts, Travelers was to relinquish claim to any balance remaining in the fund.

Pursuant to the trust agreement and through the efforts of Travelers, Ramsey, and others, petitioner was able to borrow $100,000 from the Wachovia Bank & Trust Co. to enable it to complete its projects in progress. Petitioner's note evidencing the loan was endorsed by Travelers and was secured by a first mortgage on all of petitioner's physical assets.

Proceeds of the loan were deposited on May 31, 1956, in the special account at the Wachovia Bank & Trust Co. maintained in accordance with the trust agreement of May 25, 1956. Travelers had final control over this special account, and, pursuant to the requirements of Travelers, petitioner utilized the funds made available to it to complete its then-existing contracts. All receipts from contracts on which Travelers had issued bonds and all receipts from petitioner's sale of its equipment were deposited in the special account. Thereafter, petitioner did not bid on or undertake any new jobs prior to December 10, 1957, except one small subcontracting job for Asheville undertaken July 1, 1956 (contract No. 8183).

As jobs were completed by petitioner, its equipment, when not needed on other jobs, was brought to petitioner's equipment yard where it was reconditioned. Many pieces of equipment were sold for the best price available without sacrifice and the proceeds from the sale were used to discharge the loan from Wachovia Bank & Trust Co. Ramsey's primary aim at this time was to complete contracts in progress and to do everything necessary and possible to discharge all of petitioner's debts and liabilities.

Petitioner's contracts which were uncompleted at May 31, 1956, were projects numbered 4154, 4156, 5926, 0–100, 8–452, 8182, and 8183. Contracts numbered 4154, 4156, 5926, and 0–100 were prime contracts while projects numbered 8182, 8183, and 8–452 were subcontracts for Asheville or for Taylor Construction Co. under which performance bonds were not required. Under these and similar contracts the awarding authority, usually the State or an agency or subdivision thereof, withheld a certain percentage of the amounts estimated to be due the contractor from time to time as work progressed, referred to as re-

tainage. This retainage, or a part thereof, was not usually released to the contractor until the contract work had been accepted by the awarding authority and a final estimate had been made. This usually resulted in the contractor not receiving his retainage and the amount of the final estimate until 6 or more months after he had completed the project. At times a contractor was also required to do repair and cleanup work on a project after it had been completed and accepted but before the final payments were made. The contractor at times withheld retainage from subcontractors until the final estimates were made.

Petitioner had completed substantially all its work on all of these contracts prior to December 31, 1956, and it used none of its equipment for construction work on these or any new projects during 1957. However, it did not receive its final payments on the above contracts until various times in 1957, as indicated on the table above, the total amount received in 1957 being $65,877.35. It also paid out to its subcontractors in 1957 amounts of retainage it had withheld from them for work completed in 1956 totaling $11,567.60. Petitioner also paid in 1957 relatively small amounts for repair of equipment, insurance, and damage claims, totaling approximately $2,070, most of which expenses were incurred in connection with work completed prior to 1957.

Petitioner made it a practice to maintain payroll accounts at a bank in the locality of its construction projects, which were normally closed out when the projects were completed. All of these payroll accounts had been either closed out or left with minor balances by December 31, 1956. There was very little activity in any of petitioner's bank accounts during 1957, except the special account at Wachovia Bank & Trust Co. opened under the agreement with Travelers. All of these accounts, including the latter account, were closed out prior to or on December 10, 1957.

Prior to December 1957 petitioner had received final payments on all its contracts, had paid all of its obligations under its contracts, and had repaid the Wachovia Bank loan. Its only obligation left unpaid, except possibly small current accounts, was to Ramsey for amounts advanced to it by Ramsey from time to time to meet operating expenses, plus interest thereon. In meeting its obligations petitioner had sold most of its construction equipment, retaining equipment having a book value of only about $60,000 as of December 9, 1957. It is not clear from the record whether Ramsey intended, during the latter part of 1956 and up until December 10, 1957, to discontinue the business or just to curtail it until petitioner's debts could be paid. His principal concern during this period was to complete petitioner's existing contracts and pay off all of its obligations so that no one would suffer a loss as a result of his dealings with petitioner.

An attorney for petitioner, in handling an excise tax matter for petitioner with the Department of Finance and Taxation, State of Tennessee, stated in a letter to that agency dated September 23, 1957, as follows:

Your letter of September 19th in reference to additional excise tax in the sum of $440.78 stated to be due your Department has been received, and I forthwith sent copies of same to H. F. Ramsey Company, Inc. at its office in North Carolina.

Upon inquiry I find that this company has no assets in Tennessee and has not had any assets in this state for the last two years or more. The Company is a North Carolina corporation and its offices are in Asheville. Most of its activities have been confined to that state; however, the Company became heavily involved, to such an extent in fact that it was necessary for the bonding company that was surety on its performance bonds to advance certain funds, and to secure same it took a mortgage on the assets of the Company. A liquidation has been in effect for more than a year. The Company has no existing contracts, all of same having been finished, and representatives of the Company and of the bonding company are endeavoring to sell the remaining assets to the end that its mortgage indebtedness may first be paid and, of course, if there is anything left, it will be paid to the other creditors.

*     *     *     *     *     *     *

The information which I have given you was furnished me by Mr. Ramsey, the President of the Company.

Ramsey read the letter after it was dictated and approved generally its contents.

Petitioner did not accrue income due under its contracts when the work was completed and accepted but included it in income when the amounts were actually received. Petitioner reported gross receipts from contracts on its 1957 return in the total amount of $65,877.35, which included $52,392.67 of retainage from work completed prior to 1957 and $13,484.68 of final estimates on work substantially completed in 1956 but not billed or paid until 1957. From this it deducted $13,861.14 as cost of operations (being the retainage paid to subcontractors, insurance, etc.), and reported $52,016.21 as gross profit. To this was added $33,236.26 as gain on the sale of equipment, $1,252.47 as income from scrap iron sales, and $1,123.38 as miscellaneous income, for a total income of $87,628.32. From this it deducted $23,279 of general expenses, including $7,400 in salaries of Ramsey and Browning, and $3,650.74 in wages, to arrive at taxable income before operating loss deduction of $64,349.32. Petitioner had a net operating loss deduction of $241,073.59, arising from operating loss carryovers from 1952-56, which it applied against this taxable income, which resulted in no tax being due. Respondent did not disallow the net operating loss deduction for 1957.

Beginning in 1956 and from time to time thereafter, Taylor discussed with Ramsey the possibility of his purchasing the stock of petitioner. Taylor did not want to purchase the equipment owned

by petitioner, which largely duplicated equipment owned by Asheville, and Ramsey preferred to sell it piecemeal since he thought he could get better prices if he sold individual pieces as he found buyers.

Taylor knew that petitioner had incurred losses, and he discussed the purchase of petitioner's stock with his tax adviser, a certified public accountant, R. Glenn Snipes (hereafter referred to as Snipes), who was also accountant for petitioner. Taylor knew that net operating losses could be carried over and used as deductions in succeeding years for a certain period. Snipes told him that such deductions would be useless unless there was income in succeeding years against which the losses could be applied, and Snipes did not particularly encourage Taylor's purchase of the stock. Taylor did not see financial statements for petitioner, but he understood that petitioner's total net operating losses were in the neighborhood of $200,000.

Taylor also knew that petitioner possessed an unlimited license to contract within the State of Tennessee. Taylor had attempted to obtain such an unlimited license for Asheville, without success, and Asheville's license to bid on contracts within the State of Tennessee was limited to $750,000 in 1957. The limit for Asheville was raised to $1,500,000 in 1959 and in 1961 it was made unlimited. In 1957, at Asheville's request, Asheville had bid jointly with Nello Teer Construction Co. on a State contract in Blount County, Tenn., involving over $2 million, which Asheville could not bid alone because of its limited license. Neither Asheville nor the Teer company performed the contract; they assigned it at a profit. The share of this profit to the Teer company was $62,500.

In 1958 Asheville realized total gross income of $3,107,615.02, of which the amount of $230,850.94 was attributable to work performed in Tennessee. In 1959 Asheville realized total gross income of $3,182,731.10, of which the amount of $481,750.53 was attributable to work performed in Tennessee.

From December 10, 1957, to December 31, 1959, petitioner performed a total of five contracts for which it received a total of $515,956.99 in gross income. All of these projects were in North Carolina.

Sam H. Bushnell (hereafter referred to as Bushnell), an engineer experienced in road contracting and excavation work, went to work for Asheville in September 1955. Taylor considered his services valuable, and Bushnell wanted a proprietary interest in some contracting company. Therefore, in December 1955 Asheville, Taylor, and Bushnell entered into an agreement which provided for Bushnell's employment by Asheville at a minimum salary of $9,000 per year plus a percentage of net profit bonus. Taylor also agreed to sell Bushnell 40 percent of the stock of Asheville and 40 percent of the stock of

Blue Ridge Construction Co., another corporation wholly owned by Taylor, over a 5-year period at book value. Bushnell made several payments on the stock but became dissatisfied with this arrangement because he found it impossible to save enough money after taxes to pay for the stock. But Bushnell was still desirous of obtaining an equity interest in a contracting corporation, and Taylor was apprehensive that he might lose Bushnell's services. Therefore, when Taylor was considering buying Ramsey's stock, he suggested that Bushnell purchase 40 percent of the stock of petitioner, with Taylor purchasing the other 60 percent. Taylor and Bushnell agreed to purchase petitioner's stock in these proportions, and they also agreed to nullify their prior agreement for the purchase of a 40-percent interest in Asheville and Blue Ridge. Payments made by Bushnell on the latter two stocks were returned to him.

On November 18, 1957, Taylor agreed with Ramsey and the other stockholders to purchase all of petitioner's capital stock for $7,421.40. Such price contemplated that petitioner's office furniture and fixtures with an adjusted basis of $685.74 would remain as assets of petitioner, but that all other physical assets of petitioner were required to be purchased by Ramsey in full satisfaction of petitioner's obligations to Ramsey. Taylor paid Ramsey $50 on the purchase price on November 18, and paid the respective stockholders the balance of the purchase price on December 10, 1957. Simultaneously therewith Bushnell agreed to and did purchase 40 percent of the stock of petitioner for a consideration of $3,168.56, $500 of which Bushnell paid by check dated January 2, 1958, and the remainder of which was evidenced by a demand note dated November 18, 1957, which Bushnell paid in 1959.

By December 4, 1957, petitioner had sold all its physical assets except office furniture and fixtures and 11 pieces of construction equipment which had an adjusted basis of $60,239.46.

As of December 4, 1957, petitioner was indebted to Ramsey for moneys borrowed, accrued interest, and notes in the aggregate amount of $65,171.47 as follows:

Ramsey's account charged:

| | |
|---|---|
| Notes payable | $38,000.00 |
| Open account | 19,605.65 |
| Accrued interest | 7,565.82 |
| | 65,171.47 |
| Dec. 10, 1957, Ramsey was paid the company's check | 500.00 |
| Reducing the aggregate balance to | 64,671.47 |

On December 4, 1957, petitioner sold all of its remaining physical assets except office furniture and fixtures to Ramsey for $64,671.47. Thereupon petitioner's indebtedness to Ramsey was eliminated. The

price of $64,671.47 was the approximate value of the assets and Ramsey later disposed of the equipment.

Petitioner's assets and liabilities on the dates indicated were as follows:

ASSETS

|  | Dec. 9, 1957 | Dec. 31, 1957 |
|---|---|---|
| Cash | $201. 43 | $235. 00 |
| Office furniture and fixtures | 1, 302. 37 | 1, 302. 37 |
| Reserve for depreciation | (616. 63) | (748. 35) |
| Total assets | 887. 17 | 789. 02 |

LIABILITIES AND CAPITAL

|  | Dec. 9, 1957 | Dec. 31, 1957 |
|---|---|---|
| Liabilities—Accounts payable | 431. 16 | [1] 750. 00 |
| Capital— |  |  |
| Capital stock | 185, 000. 00 | 185, 000. 00 |
| Surplus (deficit) | (184, 543. 99) | (184, 960. 98) |
| Total liabilities and capital | 887. 17 | 789. 02 |

[1] To Taylor.

Petitioner claimed a net operating loss deduction for the years 1957, 1958, and 1959 in the respective amounts of $64,349.32,[1] $76,762.89, and $41,591.10. As a result of these deductions petitioner reported no taxable income for these 3 years. As previously noted, respondent allowed the claimed carryover for the year 1957. Respondent disallowed the claimed carryover to the taxable years 1958 and 1959 under the provisions of sections 382 and 269 of the Internal Revenue Code of 1954. By motion, not resisted or objected to by respondent, petitioner requests that a net operating loss determined by respondent to have been incurred by petitioner in 1961 be taken into consideration as a net operating loss carryback to the years here involved to the extent available and necessary in computing petitioner's taxable income for these years, in the event we decide the contested issue in favor of respondent. Petitioner's motion is granted and the contents thereof shall be taken into consideration in the Rule 50 computations, if necessary.

Subsequent to the acquisition of petitioner's stock by Taylor and Bushnell, petitioner has engaged in the road construction business

---

[1] It is stipulated that petitioner claimed a net operating loss deduction of $48,718.28 for 1957. This appears to be inconsistent with further stipulations, supported by petitioner's returns, that petitioner had taxable income before net operating loss deduction of $64,349.32 in 1957 and no taxable income after the operating loss deduction. The $48,718.28 figure appears to be the approximate amount of the 1954 operating loss that was used to offset 1957 gain but does not include loss carryovers of $322.64 from 1952 and $15,308.40 from 1953 which also appear to have been offset against 1957 gain. We assume this was an oversight in the stipulation and inasmuch as it would make no difference in this case we will make no effort to have the stipulation corrected but have used what we believe is the correct figure above.

similar to that conducted by petitioner while it was under the control of Ramsey.

As shown on its returns, petitioner owned equipment having the following bases on the following dates:

|  | Equipment per depreciation schedule | |
|  | Cost basis | Adjusted basis |
| --- | --- | --- |
| Dec. 31, 1956 | $426, 195. 71 | $131, 727. 04 |
| Dec. 9, 1957 | 1, 302. 37 | 685. 74 |
| Dec. 31, 1957 | 1, 302. 37 | 564. 02 |
| Dec. 31, 1958 | 91, 122. 95 | 74, 044. 37 |
| Dec. 31, 1959 | 105, 849. 48 | 68, 737. 52 |
| Dec. 31, 1960 | 255, 610. 28 | 157, 742. 74 |

Petitioner's net worth at December 31, 1958, 1959, and 1960, as shown on its returns, was in the respective amounts of $76,801.91, $117,421.01, and $133,848.92.

### ULTIMATE FACTS

Petitioner continued to carry on, after December 1957, substantially the same trade or business conducted by it prior to December 1957.

In December 1957 Taylor and Bushnell acquired, by purchase of stock, control of petitioner within the meaning of section 269(a), I.R.C. 1954. The principal purpose of the acquisition was to avoid Federal income taxes by securing the benefit of deductions which they, the acquirers, would not otherwise enjoy.

### OPINION

The issue for decision is whether a corporation engaged in the road construction business, all of whose stock was sold in December 1957, may carry over and deduct its net operating losses incurred prior to the change in ownership from its income earned in the same type business after the change in ownership. Prior to December 1957 petitioner was principally owned and controlled by Ramsey. It suffered losses in its road construction business for the years 1951 through 1956. About the middle of 1956, because of its precarious financial position and under an agreement with its bonding company, petitioner began curtailing its activities and took on no new work after that date. It completed all contracts it then held and as its equipment was taken off of a job it was reconditioned and sold. By December 1957 petitioner had liquidated all of its obligations, except those to Ramsey, and had sold all of its equipment except 11 pieces. As of December 10, 1957, the three stockholders of petitioner sold all their stock of petitioner to Taylor and Bushnell for about $7,500 under an agreement which provided that Ramsey would first take the 11 remaining pieces of construction equipment in full settlement of petitioner's obligations to him. This left petitioner with only a small amount of cash

and some office furniture at the time of the sale. Taylor and Bushnell, who were also in the road construction business, thereafter caused petitioner to actively engage in the road construction business, which it did at a profit.

Petitioner claimed the operating losses it sustained in the years prior to 1957 as a carryover deduction against its income earned in years subsequent to the change in ownership of its stock. Respondent disallowed the net operating loss deduction for the years here involved under sections 382 and 269 of the 1954 Code.

A net operating loss deduction in an amount equal to the aggregate of the net operating loss carryovers to such year plus the net operating loss carrybacks to such year is provided by section 172 of the 1954 Code.[2] In *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1957), the Supreme Court held that in order to be entitled to a net operating loss carryover, under the predecessor section 122 of the 1939 Code, the income against which the offset is claimed must be produced by substantially the same business which incurred the losses. Further limitations on the deductibility of loss carryovers are specifically provided in sections 269 and 382 of the 1954 Code. Section 269 of the 1954 Code [3] provides that if a person or persons acquire control of a corporation and the principal purpose of the acquisition was to evade or avoid tax by obtaining the benefit of a deduction (the loss carryover here), etc., such person or corporation might not otherwise enjoy, then such deduction, etc., shall not be allowed. Supplementing section 269,

---

[2] SEC. 172. NET OPERATING LOSS DEDUCTION.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * *

[3] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * *

* * * * * * *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

* * * * * *

(c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a) ; and

(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,

shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.

section 382 of the 1954 Code[4] provides, in pertinent part, that if a person or persons acquire control of a corporation and such corporation has not continued to carry on a business substantially the same as that conducted before the change in control occurred, the net operating losses of the corporation from prior years may not be carried over to the taxable year of the change in control and subsequent taxable years.

Respondent does not argue or rely on the doctrine of *Libson Shops, Inc.*, *supra*, in this case. He relies primarily on the provisions of section 382, and secondarily on the provisions of section 269.

There is no question that the first two requirements of section 382 are met here; more than 50 percent of petitioner's stock was acquired in 1957 by Taylor and Bushnell by purchase. The issue is whether petitioner continued to carry on a business after the change in control substantially the same as that conducted by it before the change in control, within the meaning of the statute.

Respondent's position is that petitioner, under Ramsey's control, ceased to be engaged in the road construction business by the end of 1956 when it had completed substantially all of its work under its existing contracts, and was in a status of de facto liquidation during 1957, collecting only retainage withheld under contracts upon which the work was completed in 1956, paying out retainage to its subcontractors which it had withheld under subcontracts upon which the work was substantially completed in 1956, and selling off its assets and liquidating its liabilities. Respondent therefore claims that when Taylor and Bushnell reactivated petitioner in the road construction business after they bought the stock, petitioner had not continued to carry on a business substantially the same as that conducted prior to the change in ownership of its stock, so that deduction of the net

---

[4] SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.

(a) PURCHASE OF A CORPORATION AND CHANGE IN ITS TRADE OR BUSINESS.—

(1) IN GENERAL.—If, at the end of a taxable year of a corporation—

(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to—

(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

operating loss carryovers from prior years is automatically denied under section 382(a). Respondent relies principally on his regulation, section 1.382(a)–1(h) (5) and (6), Income Tax Regs.,[5] in support of his position. The validity of this regulation was recently upheld by this Court without discussion in *Fawn Fashions, Inc.*, 41 T.C. 205 (1963).

Petitioner argues that it continued after the change in control to carry on a business substantially the same as that conducted prior to the change in control, the road construction business, and consequently section 382(a) does not apply.

At first impression petitioner would seem to be right. After the change in ownership petitioner apparently engaged in the same type of road construction work, in the same locations, and with the same

---

[5] Sec. 1.382(a)–1(h) *Change in trade or business.*

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(5) In determining whether a corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock, all the facts and circumstances of the particular case shall be taken into account. Among the relevant factors to be taken into account are changes in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise. These factors shall be evaluated in the light of the general objective of section 382(a) to disallow net operating loss carryovers where there is a purchase of the stock of a corporation and its loss carryovers are used to offset gains of a business unrelated to that which produced the losses. However, the prohibited utilization of net operating loss carryovers to offset gains of a business unrelated to that which produced the losses is not dependent upon considerations of purpose, motive, or intent, but rather is established by the objective facts of the particular case. The principles set forth in this subparagraph shall be applied in accordance with the rules set forth in the following subparagraphs of this paragraph.

(6) A corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership. Thus, if the corporation is inactive at the time of such an increase and subsequently is reactivated in the same line of business as that originally conducted, the corporation has not continued to carry on a trade or business substantially the same as that conducted before such increase in stock ownership. This subparagraph may be illustrated by the following examples:

*Example (1).* X Corporation is engaged in the business of manufacturing and selling machinery. On January 1, 1958, the corporation suspends its manufacturing activities and begins to reduce its inventory of finished products because of general adverse business conditions and lack of profits. During the period between January 1 and September 1, 1958, the business of the corporation remains dormant. On September 1, 1958, A, an individual, purchases at least 50 percent in value of X Corporation's outstanding stock. On October 1, 1958, the corporation begins to manufacture the same type of machinery it manufactured before January 1, 1958. The reactivation of the corporation in the same line of business as that conducted before January 1, 1958, does not constitute the carrying on of a trade or business substantially the same as that conducted before the increase in stock ownership.

*Example (2).* Y Corporation is engaged in the business of manufacturing machinery. On January 1, 1958, the corporation suspends its manufacturing activities because of a fire which disrupts the operation of its plant. During the period between January 1 and June 1, 1958, substantial efforts are made to reactivate the business of the corporation by reconstructing the damaged plant. On June 1, 1958, A, an individual, purchases at least 50 percent in value of Y Corporation's outstanding stock. On July 1, 1958, the corporation resumes its normal manufacturing activities. The fact that the corporation's normal activities are temporarily suspended at the time of the increase in ownership does not of itself constitute a failure to carry on a trade or business substantially the same as that conducted before the increase in stock ownership.

customers, as it had engaged in when the losses were incurred. True, it was using different equipment and possibly some different employees, but this is not unusual in the road construction business, and we think the use of the word "substantially" in the statute leaves room for such variations. See *Goodwyn Crockery Co.*, 37 T.C. 355 (1961), affd. 315 F. 2d 110 (C.A. 6, 1963).

We agree with respondent that section 382 was enacted to supplement section 269 by providing an objective standard to automatically deny the loss carryover deduction if the combination of new ownership and subsequent operations of the business does not meet the standard. We also agree that in determining whether the acquired corporation continues to carry on substantially the same business all the facts and circumstances must be taken into account and evaluated in the light of the objectives of the statute. See sec. 1.382(a)–1(h)(5), Income Tax Regs. We must also consider such factors as whether "the corporation shifts from one type of business to another, discontinues any except a minor portion of its business, changes its location, or otherwise fails to carry on substantially the same trade or business." S. Rept. No. 1622, to accompany H.R. 8300 (P.L. 591), 83d Cong., 2d Sess., p. 285 (1954).

It would appear from the legislative history of section 382 that it was designed to automatically disallow the loss carryover when there was a change of ownership coupled with a change in the *type of business* conducted, to avoid the troublesome subjective question under section 269 of whether the principal purpose of the purchasers in acquiring control of the corporation was to avoid tax. But it would appear that there has to be a real change in the type of business conducted to come within this statute. This section as contained in the original House bill (H.R. 8300) provided only for a reduction in the amount of loss carryovers deductible where there had been at least a 50-percent change in the ownership of the corporation's stock. The report of the House Ways and Means Committee (H. Rept. No. 1337, to accompany H.R. 8300 (P.L. 591), 83d Cong., 2d Sess., p. 42 (1954)) explains that this provision was being added to supplement section 269 and that "It treats a business which experiences a substantial change in its ownership, to the extent of such change, as a new entity for tax purposes." However, the Senate Finance Committee rewrote the section to read as it does in the present law, denying the deduction entirely if there is the requisite change in ownership *and* a substantial change in the business. In explaining the change in its report (S. Rept. No. 1622, *supra* at 53) the committee said:

Your committee has adopted a provision to limit the application of this provision relating to purchase to those areas in which abuse has most often arisen, that is, the purchase of the stock of a corporation with a history of losses for

the purpose of using its loss carryovers to offset gains of a business unrelated to that which produced the losses. * * *

The Senate Finance Committee accordingly provided that if there has been a 50-percent change in stock ownership through purchase and if the corporation thereafter engages in a *different type of business*, the loss carryover is to be eliminated as a deduction.

It may well be that if a corporation is not carrying on an active trade or business at the time of the change in ownership and has been inactive for some period of time, and is then reactivated by the new owners in the same line of business previously conducted, this would constitute a substantial change in the *type of business* within the intendment of the statute, as provided in section 1.382(a)–1(h)(6) of the regulations. At least we have found the regulation to be valid when applied to a situation where the corporation had been through receivership and bankruptcy and had been inactive for about 2 years. *Fawn Fashions, Inc., supra.*[6] But the circumstances there were quite different from those here and neither the regulation nor the last-cited case precludes our reaching a different conclusion under the circumstances of this case.

Here petitioner was required by its circumstances, its bonding company, and Ramsey's desire to assure that no outsiders suffered a loss in their dealings with petitioner, to curtail its operations until it could see its way clear to take on more work if Ramsey desired to do so. While it took on no new projects after July 1956, it did complete the several projects then in progress. It appears that all these projects were substantially completed by the end of 1956 but petitioner could not be certain until the jobs were finally accepted in 1957 and the final estimates were paid just how much additional income it would receive and how much retainage it would have to pay out to its subcontractors. It was not until this became certain that petitioner could be in a position to take on new business. It was apparently also necessary for petitioner to sell most of its equipment as well to pay out all of its obligations. There is no evidence that Ramsey intended to terminate petitioner's business activities permanently at any time during this period. His own testimony indicates that he was uncertain just what his future course of action would be until petitioner was clear of its obligations. At the time of his final negotiations with Taylor the corporation still had construction equipment worth about $60,000 and it seems clear that had Ramsey wanted to continue the business he could have done so by putting more money into it. Petitioner denuded itself of the remainder of its equipment only as a part of the agreement under which its stock was sold to Taylor. This is

---

[6] To conclude otherwise would make the statute completely ineffective to prevent trafficking in loss corporations within the same industry.

explained by the fact that this equipment duplicated to some extent equipment already owned by Taylor or his company and by the fact that Ramsey thought he could sell the equipment to others for more than he could get out of it from Taylor.

While what Taylor and Bushnell actually bought was pretty much of a shell corporation, petitioner was not a shell immediately prior to the negotiations for sale. It was a viable corporation which had been actively engaged in the road construction business but which was temporarily inactive. Taylor and Bushnell did not transfer to it a different type of business or, so far as the record shows, any business at all. Compare *Arthur T. Beckett*, 41 T.C. 386 (1963) ; *Huyler's*, 38 T.C. 773 (1962), affd. 327 F. 2d 767 (C.A. 7, 1964) ; *Frank Spingolo Warehouse Co.*, 37 T.C. 1 (1961) ; *J. G. Dudley Co.*, 36 T.C. 1122 (1961), affd. 298 F. 2d 750 (C.A. 4, 1962). Nor did petitioner change the location of its business, compare *Federal Cement Tile Co.*, 40 T.C. 1028 (1963), affd. 338 F. 2d 691 (C.A. 7, 1964) ; nor did it merge with an entirely separate business entity, compare *Julius Garfinckel & Co.*, 40 T.C. 870 (1963), affd. 335 F. 2d 744 (C.A. 2, 1964). The purchasers simply caused petitioner to continue in substantially the same business it had been engaged in when it incurred the losses, cf. *Euclid-Tennessee, Inc.*, 41 T.C. 752 (1964), on appeal (C.A. 6, May 18, 1964), and were fortunate enough to make a profit from that business. The income against which petitioner seeks to offset the prior losses was produced by substantially the same business enterprise that produced the losses. The only difference was that it was owned by different persons. But a change in ownership alone is not enough to meet the objective standard of section 382, and respondent will have to look elsewhere to justify disallowance of the loss carryovers here involved. Cf. *Jackson Oldsmobile Inc.* v. *United States*, 237 F. Supp. 779 (M.D. Ga. 1964).

Respondent also determined that the net operating loss carryovers claimed by petitioner are not allowable under section 269 of the 1954 Code. The pertinent parts of section 269 provide generally that if any person or persons acquire control of a corporation and the principal purpose for such acquisition was avoidance of income tax by securing the benefit of a deduction which such person or corporation would not otherwise enjoy, then such deduction, being the net operating loss deduction here, shall not be allowed. This section has been applied to disallow a deduction, or other tax benefit, to the acquired corporation if the principal purpose of the acquiring person was tax avoidance. *Thomas E. Snyder Sons Co.*, 34 T.C. 400 (1960), affd. 288 F. 2d 36 (C.A. 7, 1961) ; *Baton Rouge Supply Co.*, 36 T.C. 1 (1961).

Respondent's determination is presumptively correct and the burden is on petitioner to prove that tax avoidance was not the principal purpose of Taylor and Bushnell in acquiring control of petitioner. In

addition, section 269(c) provides that the fact that the consideration paid by the acquirer for the stock of the corporation is substantially disproportionate to the aggregate of the adjusted basis of the property of the corporation and the tax benefits not available to the acquirer otherwise than as a result of the acquisition shall be prima facie evidence of the principal purpose of tax avoidance. The legislative history of this provision indicates that "disproportionate" means that the consideration paid for the stock is substantially *less* than the adjusted basis of the corporate property plus the value of the tax benefits. S. Rept. No. 1622, *supra* at 39.

Respondent argues that because the $7,500 paid by Taylor and Bushnell for the stock of petitioner was substantially *in excess* of the $887.17 adjusted basis of petitioner's assets at the time of acquisition, and because the consideration paid was substantially *less* than the total of petitioner's basis in the assets plus the value of the tax benefits possibly made available by the acquisition, section 269(c) is applicable. We are frank to say that while we can discern why the provisions of section 269(c) would be apt in some corporate acquisition situations, we are somewhat at a loss to understand why the "procedural device" (see H. Rept. No. 1337, *supra* at A67) provided by that provision should be prima facie evidence of a purpose to avoid tax under the circumstances of this case. If it were clear simply that the purchaser paid more for the stock than the value of the corporate assets it would be indicative of a purpose to acquire something in addition to the corporate assets, such as a net operating loss deduction. But the fact that he paid less than the aggregate value of the corporate assets and the tax benefits, which could mean less than the value of the assets alone, is hardly indicative that he was purchasing a tax benefit. In any event we will not rely on section 269(c) because we have found from the evidence as a whole that the principal purpose of Taylor and Bushnell in acquiring the stock of petitioner was to avoid tax by using petitioner's operating loss carryovers to offset income produced by the operation of the business under their control.

Petitioner contends that Taylor, and Bushnell, acquired the stock of petitioner for bona fide business purposes, which cumulatively outweighed the presumption running in favor of respondent's determination, and that the principal purpose for the acquisition was not tax avoidance. In support of its position petitioner relies principally on the following factors:

(1) Petitioner was a going concern, with a good name, goodwill, and good employees, and already had licenses to operate in several States, particularly Tennessee, which would provide a good vehicle for Taylor to use in the expansion of his business, which he anticipated as a result of the Federal highway program.

(2) Petitioner had an unlimited license to do business in Tennessee, which Taylor had been unable to obtain for his own company, and which had cost his company in lost profits.

(3) Taylor was anxious to retain the services of Bushnell, who was insisting on an equity interest in the road construction business, and the acquisition of petitioner provided an opportunity for Taylor and Bushnell to share an interest in a business at a price Bushnell could afford.

We do not question the fact that Taylor had some bona fide business reasons for wanting to buy petitioner. Although petitioner had practically no tangible assets when Taylor bought it, it was a going concern, it did have licenses to operate in several States, and it had certain intangibles such as goodwill. Unfortunately we cannot tell from the record how much of the consideration paid for the stock, if any, was paid for these attributes of petitioner. Although both Taylor and Ramsey were witnesses in the trial of this case, no questions were asked either of them concerning the actual negotiations by which the selling price was agreed upon. The consideration paid was an odd amount, $7,421.40, and it must have been negotiated in specifics, to some extent at least. So far as we can tell, it has no relation to the book or actual value of the physical assets of petitioner. It was considerably in excess of the latter value, which had an adjusted basis of $685.74, so we must assume the excess was paid for something other than the physical assets.

Taylor also testified that he was anxious to obtain the services of various employees of petitioner, particularly Browning. The fact is that Browning was employed by Asheville, on a part-time basis at least, at the time Taylor purchased petitioner. There is no reason to believe that these employees would not have been happy to obtain employment with Taylor, who was in the same type of business, had Ramsey gone out of business or even if he had moved to a different location.

Taylor placed considerable stress on the fact that petitioner had an unlimited license to do business in Tennessee which Taylor was unable to obtain for his company until about 1961. He cites as an example of the value of this unlimited license an incident in which he and Bushnell wanted to bid on a Tennessee contract but could not do so because it exceeded his company's limits, so Asheville had to bid jointly on the contract and share the profits with Nello Teer Construction Co. But we have no way of knowing whether Asheville was either capable of handling a contract of this magnitude or willing to assume the risks, even if it had been permitted to bid on it individually. Furthermore it appears that neither Teer nor Asheville actually performed any work on the contract, but instead assigned it for a substantial profit to both

of them. In addition the history of both petitioner's and Asheville's operations in Tennessee, both before and after the change in control of petitioner, does not support the theory that a Tennessee license in excess of that held by Asheville in 1957 was of any substantial value to Taylor. We can understand that it may have been nice to have and that it might have cost less to acquire it through purchase of petitioner than in the usual way, but we are not convinced that this was a very weighty reason for Taylor's and Bushnell's purchase of petitioner's stock.

Petitioner's most convincing argument is that Taylor wanted to acquire petitioner as a vehicle in which he and Bushnell could share the equity interest in a construction business at a price Bushnell could afford to pay. We are not impressed by the ancillary argument that Taylor was afraid that if he did not buy petitioner Bushnell would have done so and gone into competition with Asheville. There is no evidence that Bushnell had the capital or financing necessary to take over Ramsey's business on his own.

But while it probably was easier for Taylor and Bushnell to buy a going concern in order to share an equity interest in the construction business, we cannot say from the record that it would have cost any more, if as much, for Taylor and Bushnell to have formed a new corporation, with a small capital, to enter into such a relationship. It is obvious that even this seemingly valid business reason for Taylor to acquire petitioner is based principally on the fact that by using petitioner to operate the business and using its operating loss carryovers to offset the profits of the business, Bushnell, as well as Taylor, could build up an equity in the business much more rapidly because there would be no corporate taxes to pay until the losses were absorbed. While Bushnell testified that he had no knowledge of operating loss carryovers when he entered into this transaction, it is a little hard to accept this testimony at face value in the light of his testimony that he had become dissatisfied with his prior arrangement with Taylor to buy a 40-percent interest in Asheville because he could not save enough money after taxes to pay for it. Furthermore, it is clear that Taylor was aware of both petitioner's operating losses and the tax advantage that might be gained by utilizing those losses to offset subsequent profits of petitioner. He had taken advantage of such benefits when he acquired Asheville.

It is also apparent, and must have been apparent to Taylor, Bushnell, and their tax adviser, that if petitioner could be operated at a profit the tax savings resulting from the use of petitioner's approximately $175,000 in loss carryovers would be by far the most valuable asset they had acquired. Of course this was dependent on petitioner being operated at a profit after they acquired it, but Taylor had

operated his business at a profit theretofore and there was no reason to believe that he and Bushnell could not operate the same type business at a profit, particularly in view of Taylor's optimism about the future of the road construction business in the light of the Federal highway program, and the possibility of either bidding profitable jobs directly in the name of petitioner or having Asheville subcontract profitable work to petitioner, which apparently was done.

Finally, petitioner argues that had tax avoidance been Taylor's principal purpose in acquiring petitioner he would have bought all the stock himself and then merged one of his other corporations into petitioner to take advantage of petitioner's loss carryovers. This argument is of dubious validity in view of the fact that the Supreme Court had just a short time before (May 27, 1957) decided the *Libson Shops* case, which put a damper on use of premerger losses of one of the corporations in a merger to offset the postmerger profits of the other corporation in the merger. Again unfortunately, we did not have the benefit of the testimony of the tax adviser of both Taylor and Ramsey, who was cocounsel in this case, but we feel sure that he was aware of the implications of the *Libson Shops* case when Taylor discussed this transaction with him. See *Frank Spingolo Warehouse Co., supra.*

In conclusion, while we recognize that Taylor and Bushnell may have had some bona fide business reasons for acquiring petitioner, we believe that the record as a whole supports respondent's position that the principal purpose of Taylor and Bushnell in acquiring control of petitioner was to avoid tax by obtaining the benefit of petitioner's operating loss carryovers which they otherwise would not have had; and we have so found as an ultimate fact. Certainly, the record does not carry petitioner's burden of proving that such was not the principal purpose for the acquisition. Consequently, respondent is sustained in disallowing the net operating loss deduction claimed by petitioner for the years here involved.

To take into account petitioner's net operating loss carryback from 1961,

*Decision will be entered under Rule 50.*