PRINCETON AVIATION CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Princeton Aviation Corp. v. Commissioner
Docket No. 2302-77.
United States Tax Court
T.C. Memo 1983-735; 1983 Tax Ct. Memo LEXIS 45; 47 T.C.M. (CCH) 575; T.C.M. (RIA) 83735; December 12, 1983. Herbert L. Zuckerman and Alan E. Sherman, for the petitioner. Daniel *46 K. O'Brien and Matthew Magnone, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Year
Ending
Deficiency
5/31/71
$46,581
5/31/72
122,127
5/31/73
171,721
5/31/74
55,810
The issues for decision are: (1) whether petitioner's utilization of net operating loss carryforwards during the years in question should be disallowed pursuant to section 269; [1] and (2) whether the benefit of those same carryforward losses should be disallowed pursuant to section 382(a). FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by this reference. Princeton Aviation
Princeton Aviation Corporation (hereinafter PAC or petitioner) was incorporated under the laws of the State of New Jersey on June 26, 1963. PAC's principal place of business was Teterboro, New Jersey at the time that it filed its petition herein. It timely filed United *47 States corporation income tax returns for its four fiscal years ending May 31, 1971 through May 31, 1974. PAC's main function and purpose during the years in question was to conduct a fixed base airport operation on 50 acres of land it leased in Somerset County, New Jersey (hereinafter the airport land or airport property). The facilities at that location have been used for airport operations since approximately World War I, thereby ranking it among the oldest continuing general airports in the United States. During the taxable years ending May 31, 1966 through May 31, 1970, petitioner reported the following net operating losses: Taxable Year
Net Operating
Ending
Loss
5/31/66
$11,979
5/31/67
94,671
5/31/68
224,591
5/31/69
488,403
5/31/70
5,455
TOTAL
$825,099
On its returns for the taxable years May 31, 1971 through May 31, 1974, petitioner applied the above losses against its otherwise taxable income as follows: Amount Applied in Taxable Year Ending May 31
Year Ended
Loss
1971
1972
1973
1974
5/31/66
$11,979
$11,979
5/31/67
94,671
84,666
$10,005
5/31/68
224,591
224,591
5/31/69
488,403
19,835
$357,752
$110,816
5/31/70
5,455
5,455
*48 Petitioner was incorporated by Webster B. Todd, Jr., (Todd) who was its president from its inception until the sale of its stock in 1969. Todd owned in excess of 50 percent of petitioner's issued and outstanding stock. The other major shareholder was Lawrence J. Tokash (Tokash), who became petitioner's vice-president and remainded so until 1969. The original shareholders of petitioner were Todd, Takash, and Mr. Richard Herold, Todd's attorney, who held one qualifying share. In early 1969, the shareholders, the number of shares they each held, and their corresponding percentage interest in petitioner were as follows: Number of
Percentage
Shareholder
Shares
Interest
Webster B. Todd, Jr.
9,542
54.25
Lawrence J. Tokash
7,292
41.46
Webster B. Todd, Sr.
501
2.85
Eleanor Schley Todd
250
1.43
John L. Winston
1
*
Thomas L. Pulling
1
*
Summer Gerald, Jr.
1
*
TOTAL
17,588
100 percent
Webster B. Todd, Sr. and Eleanor Schley Todd (who we assume are Todd, Jr.'s parents) did not involve themselves in the business operations of the corporation. Todd and Tokash had been operated a leasehold *49 fixed base operation at a nearby airport facility at Basking Ridge, New Jersey when the operation of the Princeton Airport became available for purchase in 1963. Eventually, they acquired the Princeton Airport operation (including the land, airport facilities, and surrounding acreage). That acquisition was structured in a manner whereby PAC (which was founded for this purpose) acquired the airport operation, while the land and airport property was purchased by Todd and his wife personally. The Princeton airport property consisted of approximately 50 acres. [2] It was acquired by Todd and his wife, Sheila O'K Todd, during the years 1963 and 1964. On October 2, 1968, Todd and his wife transferred the airport property to DeForest Realty Company. No consideration was given for the transfer. Todd was DeForest Realty's president and he owned 1,065 shares of its stock. The only other shareholders of DeForest Realty were Sheila O'K Todd (1 share) and Mr. Herold (also 1 share). [3]
*50 From incorporation in 1963 until its sale in 1969, PAC, under Todd's direction, leased the Princeton airport property from Todd or from DeForest Realty. Partly as a result of this lease agreement, PAC was indebted to Todd in March of 1969 in an amount approximating $390,000. The corporation also had various bond issues outstanding in the amount of $110,000 that were convertible into common stock. These bonds generally were owned by friends and relatives of Todd. Prior to March 1969, petitioner's business operations consisted of a scheduled air carrier service [4] (known as Princeton Airways), a charter service, a flight training department, aircraft rentals to licensed pilots, a maintenance shop, a radio shop, sales of aircraft and parts, gasoline and oil sales, and a hanger and tie down service. The scheduled commuter air carrier service ran from Princeton to Newark, New Jersey, Washington National, and New York's John F. Kennedy Airports pursuant to an FAA operating certificate. [5] The scheduled commuter *51 air carrier service carried about 3,000 to 4,000 passengers per month and utilized approximately ten aircraft. By 1968 and early 1969, petitioner was losing large amounts of money from its business operations, with most of the losses attributable to the scheduled commuter air carrier service. [6] By March of 1969, petitioner was on the verge of declaring involuntary bankruptcy. Prior to reaching that financial precipice, Todd began contacting other operators in the area to publicize the fact that the corporation and the land were for sale. [7]
Todd spoke with many local operators, but could not strike a deal. As will be explained more fully later, he also received inquiries from nonaviation-oriented real estate developers, (e.g. shopping center builders) but rejected these because he did not want the facility's function as an airport to terminate. On March 8, 1969 Todd *52 entered into an oral lease on behalf of PAC with Suburban Airlines (Suburban), a competitor of PAC. Suburban was granted the exclusive right to conduct a scheduled air carrier service business at Princeton Airport including the right to lease counter space. Suburban agreed to pay 30,000 shares of Commuter Airline (a subsidiary of Suburban) stock in addition to $1,000 per month for the counter space. At the time of the lease, Commuter Airline stock was trading in the over-the-counter market at about $7 per share.Suburban moved in and took over operation of the Princeton Airways schedule on March 10, 1969. However, the stock was never delivered to petitioner or Todd, and Suburban quit the lease some nine months later. Todd's reason for first selling the right to operate the scheduled air taxi operation separately from the fixed base operation was that a quick deal at a good price could be arranged. This was because PAC's routes had an identifiable value resulting from traffic congestion in the Northeast Corridor. [8] This congestion had caused the FAA to establish in 1967 what was known as the High Density Traffic Rule. That Rule froze the number of air taxi operations that *53 could be conducted at the airports Princeton Airways serviced. Princeton Airways, however, along with other operations, was grandfathered-in under the regulation. As a result, the corporation's landing or operating slots in New York and Washington became more valuable. The Teterboro Group
David A. Van Dyke (Van Dyke) and Donald Hulse (Hulse) acquired the Teterboro School of Aeronautics in 1952. Over time they expanded in size to a fixed base airport operation at Teterboro Airport in Teterboro, New Jersey, which is located 50 miles from the Princeton Airport. Van Dyke and Hulse were also stockholders in Metropolitan Mooney, Incorporated (hereinafter Met Mooney), as well as other affiliated corporations. These corporations comprised what we will refer to as the "Teterboro Group." All of the corporations of the Teterboro Group operated out of the Teterboro Airport. The Teterboro Group sold aircraft while operating both as Cessna and Mooney (types of aircraft) dealerships. These two aircraft lines were strong competitors. *54 As a consequence of this conflict, the representatives of Mooney Aircraft requested at various times that the Teterboro Group's sales operations be divided and placed at separate locations to market each brand of airplane. The Teterboro Group fixed based airport was lessed from the Port of New York Authority. As the Teterboro Group grew and air congestion in the Northeast Corridor increased, the Teterboro Group became cramped for space.Moreover, the Group was liable for a $1.50 fee for every landing they partook in at the Teterboro Airport. Because the Group was involved in approximately $100,000 landings per year, this placed an unnecessary expense on people taking flight training. The lease with the Port of New York Authority also provided that the Port Authority was entitled to a percentage override on all aircraft sales. In addition, Pan American Airways, who used the airport, was expanding operations and it appeared that Pan Am would be dominating the airport. This had the portent of still higher fees and less space for the smaller operators who used the facility, such as the Teterboro Group. For these reasons, the Group started investigations in 1968 to acquire one or *55 several other airport facilities in order to expand. [9]
The Acquisition Agreement
Immediately after the granting of the lease to Suburban Airlines, Todd met with Van Dyke to negotiate the possible sale of the Princeton Airport fixed base operation and the airport land.
Van Dyke knew that Todd's operation was in financial trouble. Respondent at that time had an unsatisfied claim against the corporation for unpaid withholding taxes from prior years in the amount of $41,000. Todd and Van Dyke (on behalf of Met Mooney) then struck a deal for the sale of the airport operation and land just before respondent's agents were about to physically lock up the PAC facility to foreclose on the tax lien. Met Mooney management personnel moved in the next business day to take over operation of the airport.[10] At the time of this handshake agreement and as part of the deal, Van Dyke gave Todd a check for $41,000. The proceeds of the check were used to satisfy respondent's *56 claim against the corporation. The Todd-Van Dyke agreement called for Met Mooney to acquire the airport land from Todd (see footnote 3, supra) along with the PAC stock as a package deal. The purchase price for the package of land and stock was set at $111,000 cash plus Met Mooney's assumption of all liabilities and mortgages pertaining to those properties, with the following exceptions: (1) The $390,000 owed to Todd by the corporation would be erased from the corporation's books and not be payable by Met Mooney on acquisition of the stock; (2) the $110,000 in convertible debentures were to be surrendered and replaced by notes payable by Todd personally. [11] This was done to guarantee that Met Mooney would be the sole shareholder of petitioner. *57 The $111,000 cash was to be paid in three installments: $41,000 at the beginning, $39,000 on the execution of the contract, and $31,000 at the closing. This agreement was with the parties' understanding that the mortgages attached to the land would not exceed $625,000. [12] Herold delivered the PAC shares to Met Mooney on or about March 28, 1969 as security for the $41,000 cash advanced. Van Dyke's attorney was Joel Sondak, who also worked as counsel to Met Mooney. After the deal for the airport land and PAC stock purchase, Van Dyke described his agreement with Todd to Sondak and instructed Sondak to draw up the necessary papers. Sondak originally drafted the documents according to Van Dyke's specifications. But in negotiations with Herold and because he was immediately baseiged by PAC's creditors once Met Mooney took over the Princeton operation, Sondak became alarmed by a number of perceived problems: (1) His client had already surrendered the $41,000 in cash, yet did not know for sure who had legal title to the airport property--PAC, *58 Todd personally, or DeForest Realty. (2) Sondak did not know whether all the liens on the airport property were current (including real estate taxes); whether the parties involved could pass good and marketable title; and, if the liens were not current, whether a certificate could be obtained whereby transfer of title could not make them then due and owing on the purchase. (3) The balances on the first, second, and third mortgages on the land and the security interest on the hangars were not known. (4) There were no current figures on accounts payable to the corporation. More importantly, it was not known whether there were significant undisclosed liabilities that would be transferred to Met Mooney if it acquired the PAC stock. Because of the above factors, Sondak insisted that his client, Met Mooney, not purchase the stock of the corporation. Todd, however, insisted that Met Mooney purchase the stock. Van Dyke, not wanting a bargain to slip away, agreed with Todd. Sondak still advised Van Dyke that he "did not want him touching stock" primarily because of the possibility of undisclosed liabilities. However, Sondak felt that his hands were tied because Van Dyke had already *59 given Todd $41,000 and Met Mooney would stand to lose that money if it then backed out of the deal. Sondak therefore proposed that Mooney instead acquire an option for the purchase of the stock until the liabilities of the corporation could be determined. The option was to expire May 15, 1969. Todd, despite his previous demand that Met Mooney also purchase the PAC stock, and in full knowledge of the resulting ramifications, acquiesced to granted the option. [13]
After further negotiations among respective counsel, it became apparent that the original terms agreed to by Tood and Van Dyke would have to be altered further.By lease dated April 9, 1969 Todd and his wife Sheila leased the airport property to Met Mooney, to be used and occupied as a private commercial airport holding exclusive right to provide, among other things, air charter, aircraft sales, repair, and flight school services. The term of the lease was stated in that agreement to begin on April 1, 1969 and *60 to end March 1, 1980. Todd and Van Dyke structured this transaction as a lease, rather than the previously agreed-to sale, because the property was encumbered by mortgages bearing interest rates lower than those prevailing at the time of the transaction. Sale of the land would trigger the due-on-sale clauses of the various encumbrances. This leasing technique avoided acceleration of the mortgages, thereby enabling the favorable financing to continue. The lease provided that it was the intention of the parties that the rental payments would amortize existing loans against the airport property and that the tenant could purchase the premises at any time during the lease term for an amount equal to the principal and interest due on the then outstanding liens attached to the property. The lease also contained a provision that if the oral arrangement with Suburban Airlines "matured into a contract," such contract would be honored by Met Mooney. Also, if Suburban abandoned its rights, the air taxi service would inure to the benefit of Met Mooney. Met Mooney exercised its right under the lease agreement to purchase the airport land on September 23, 1969. This was accomplished by *61 Todd and Sheila amending the lease agreement between them and Met Mooney. The amendments provided that the lease shall be construed as a contract of sale of the airport property and that all equities, right of redemption, and equitable conversion passed to Met Mooney at the time of the actual commencement of the lease (April 9, 1969). The amount of cash that eventually changed hands as a result of the agreement was slightly less than the $111,000 previously stated. The actual amount, the payee, and the disposition of the funds are described in the table below. TABLE I Date of Check
Amount
Payee
Disposition
(Unknown)
$ 41,000.00
Richard Herold,
Paid past due withholding
Trustee
taxes of the corporation
April 4, 1969
39,000.00
Richard Herold,
Payment to Sommerset Trust
Trustee
Co. for mortgages of
$24,595.12, and to Marsh P.
McLandon for payment of an
insurance bill.
(Unknown)
6,000.00
Todd
(Unknown)
July 25, 1969
21,264.17
I.R.S.
Payment of the corporation's
taxes.
TOTAL CASH
DISBURSEMENT
$107,264.17
The purchase price for the airport package of stock and property was $658,185.97, *62 determined as follows: Original Price
$736,000.00 Less: (a) Corporation liabilities
in excess of book value of
assets. [14]
(77,850.89)
Unlocated adjustment
36.76 Adjusted Purchase Price
$658,185.87 The adjusted purchase price was remitted in the following manner: Assumption of mortgages
$613,784.94 Cash payment
107,264.17 Less adjustments: *
(a) Mortgage reduction
by seller
$52,000.00
(b) Insurance reduction
by seller
900.00
(c) Cash refund to buyer
on closing
9,963.24
(62,863.24)
NET CONSIDERATION
$658,185.87 An appraisal of the airport property dated April 3, 1969 stated that the airport land and improvements had a fair market value of $1,240,000. On September 23, 1969 (the date of the lease recharacterization), Mooney entered into an agreement with Todd [15] whereby Met Mooney purchased *63 all of the outstanding common stock of petitioner for the consideration of $1.00. Three days later, Met Mooney transferred all right, title, and interest in the September 23, 1969 agreements to Van Dyke and Donald Hulse (i.e., Van Dyke and Hulse became owners of the land and petitioner's stock). Princeton Aviation Operations
The books and records of petitioner for the fiscal years ended May 31, 1968 through May 31, 1974 reflect the following figures for gross revenue: Sales
Year
Aircraft
Gas & Oil
Parts
1968
$475,601
$35,311
$49,678
1969
500
29,297
31,549
1970
182,791
51,241
45,913
1971
3,077,734
36,079
45,881
1972
5,141.521
39,865
51,336
1973
8,418,101
44,694
76,054
Services [16]
Year
Maintenance
Flight Rev.
Air Taxi
Hangar
1968
$35,561
$144,185
$357,274
$17,838
1969
33,103
122,283
275,418
18,170
1970
58,908
98,028
36,519
1971
49,403
99,703
28,429
1972
37,513
277,779
27,724
1973
56,981
299,478
31,727
*64 The fiscal year ended May 31, 1974 had the following figures for gross revenue: Item
Amount
Aircraft Sales
$8,813,497
Flight Instruction-Charts
107,357
Air Taxi
Aircraft Rental
108,019
All other income
195,311
Petitioner held various Federal and state licenses that were necessary to its fixed base operations. These included, among others: a general airport license, a New Jersey fixed base operator's license, a flying school license, and approval from the Veteran's Administration to provide education and training. Had Met Mooney purchased only the airport property and *65 not the stock of the corporation, it would have been required to apply for and receive new licenses. During the application period of the licenses, the airport would have had to cease operations. The time necessary for processing the new licenses would be (assuming their approval by the various agencies): approximately 2 to 3 weeks for the general airport license and the New Jersey fixed based operator's license, 3 weeks for Veterans Administration approval, 10 days for the FAA flying school license, and 4 days for the air taxi and repair station licenses. Assuming proper planning, these times would all run concurrently. Principal Purpose of the Acquisition
As mentioned previously, Todd insisted, as of the time of the April 9, 1969 agreements, that the airport property and PAC stock be sold together. The reason for this demand was Todd's level of involvement with the corporation. From acquisition until the sale to Met Mooney, Todd had made substantial improvements in the airport property and its operation. He therefore had become strongly identified with Princeton Airport, and any success or failure of the facility would be attributable to him. Todd's family was *66 well-connected in political circles. Todd's mother and grandmother had served as vice-chairwomen of the Republican National Committee, both of his grandfathers and his father were at one time New Jersey Finance Chairmen, and Todd's brother was a NATO ambassador in 1953 and 1954. Todd hoped to capitalize on his family's connections. However, his ability to obtain any type of significant political appointment was threatened by the Princeton Corporation setbacks. Were PAC to fail with him at the helm, which was an imminent possibility at the time, he also would have had to declare personal bankruptcy. The stigma that would have attached from this deemed lack of business acumen would, in Todd's mind, result in making him an untouchable in political circles. Todd wanted to get out from under the airport operation but have it continue services under its same name and provide an appearance of success. [17] In his opinion the sale of the stock would accomplish this. *67 In order to ascertain what PAC's liabilities were, as well as to work up balance sheets for the previous years, Todd (acting for PAC) hired Arthur Foy, a Certified Public Accountant. Foy was to perform a general audit of petitioner. Foy was retained in late March 1969, but did not begin work until June of that year. The audit was completed about July 30, 1969. In June 1969, Foy and an associate met with Todd, Van Dyke, and Hulse for five hours to discuss the PAC financial situation. No particular attention was given to the tax aspects of acquiring the corporation at that time, but there was a general apprisal of PAC's poor financial performance over the prior years. On July 30, 1969, Foy met with Hulse, who also was an accountant, to discuss the result of the audit about to be concluded.The meeting lasted one and one-half hours. Prior to that meeting Foy had prepared a scratch sheet which showed all of PAC's net operating losses which were available for carry forward to later yars. [18] *68 The information regarding the net operating losses was compiled at the specific request of someone. Although Foy could not definitely recall whom, it is clear it was contemporaneous with the July 30, 1969 meeting with Hulse. [19] Because he was retained only to do an opinion audit, Foy would not have voluntarily provided this particular information. ULTIMATE FINDINGS OF FACT 1. The principal purpose for Met Mooney's entering into the April 9, 1969 leasing agreement, stock option, and eventual purchase of the PAC stock was not for the principal purpose of evasion or avoidance of Federal income tax. 2. At all relevant times, PAC carried on substantially the same trade or business that it did prior to its acquisition by Met Mooney. OPINION Respondent asserts that section 269 applies to Met Mooney's acquisition of PAC stock to disallow all the tax benefits that may inure to Met Mooney as a result of the purchase. In the alternative, respondent claims that PAC's principal business before the acquisition was as *69 the provider of a scheduled air carrier service and that this business was abandoned subsequent to the change in ownership in favor of PAC increasing its sales operation. Respondent therefore asserts that the net operating loss carryforwards should be disallowed because of the applicability of section 382(a). Issue 1.Section 269
Section 269[20] provides for the disallowance of a tax benefit, inter alia, if the principal purpose of the acquisition of direct or indirect control of a corporation is tax avoidance through the securing of such a benefit. *70 Section 269 is designed to prevent the use of other sections of the Code to provide deductions, credits, or allowances in evading or avoiding Federal income tax. Section 1.269-2(a), Income Tax Regs.
Respondent's section 269 argument, simply put, is that at the time of the exercise of the option to acquire the PAC stock, Met Mooney's only intent could have been to receive the windfall benefit of a $825,000 net operating loss carryforward in exchange for $1.00.This is because at all pertinent times subsequent to the granting of the option, PAC had divested all of its assets except the various FAA certificates, state licences and the right to receive $1,000 per month from Suburban Airlines. [21]
Petitioner claims that tax avoidance was never Met Mooney's principal purpose in acquiring the corporation. It asserts that it did not want to acquire the PAC stock because of a fear of acquiring contingent liabilities and only agreed to do so at the insistence of Todd. Because Todd would not sell the airport property to *71 anyone who would not also take the stock and continue to run the airport under the name Princeton Aviation, petitioner contends that the acquisition was the result of a bona fide business purpose and therefore safe from the prohibitions of section 269, citing Baton Rouge Supply Co. v. Commissioner,36 T.C. 1 (1961). We agree with petitioner for the reasons set out below. First, respondent claims that the presumption of tax avoidance provided by section 269(c) applies in the instant case because the value of the tax benefits to be derived (a $825,000 loss) is substantially disproportionate to the consideration paid ($1.00). The regulations state that section 269(c) adds further weight to the presumption of correctness of the Commissioner's determination. Section 1.269-5, Income Tax Regs. However, we do not place significant reliance on section 269(c). We have stated in earlier cases that the relationship between that subsection and tax avoidance motives is unclear and that the provision is merely a "procedural device." Glen Raven Mills, Inc. v. Commissioner,59 T.C. 1, 16 (1972); H.F. Ramsey Co. v. Commissioner,43 T.C. 500 (1965). *72 We have also stated that we can see no reason why there should be a presumption of tax avoidance where, as here, the amount paid for stock is less than the value of the corporate assets. [22]Industrial Suppliers, Inc. v. Commissioner,50 T.C. 635, 646 (1968). Compare Scroll, Inc. v. Commissioner,447 F.2d 612, 618 (5th Cir. 1971), affg. a Memorandum Opinion of this Court. Section 269 establishes two tests that must be met before its *73 sanctions apply. First, a person (defined as including a corporation) must acquire control of a corporation. Second, the principal purpose of such acquisition must be tax avoidance. Commodores Point Terminal Corp. v. Commissioner,11 T.C. 411, 416 (1948). Because the parties agree that Met Mooney acquired control of PAC, the only issue before us regarding section 269 is what was Met Mooney's principal purpose for such acquisition. [23]
*74 The determination of the purpose of the acquisition presents a question of fact which must be resolved by considering all the facts and circumstances of the entire transaction. D'Arcy-MacManus & Masius, Inc. v. Commissioner,63 T.C. 440, 449 (1975); section 1.269-3(c), Income Tax Regs. The burden of proof rests with the petitioner. American Pipe and Steel Corp. v. Commissioner,243 F.2d 125 (9th Cir. 1957), affg. 25 T.C. 351 (1955); Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a); [24]section 269(c) and section 1.269-5, Income Tax Regs.[25] However, to prevail, petitioner need only prove that the avoidance of tax was not the principal purpose. Capri, Inc. v. Commissioner,65 T.C. 162, 178 (1975); Bush Hog Mfg. Co. v. Commissioner,42 T.C. 713, 719 (1964). To determine what the principal purpose was, section 1.269-3(a), Income Tax Regs., states that "[i]f the purpose to evade or avoid Federal income tax exceeds *75 in importance any other purpose, it is the principal purpose." Cf. Hawaiian Trust Co., Ltd. v. United States,291 F.2d at 765; D'Arcy-MacManus & Masius, Inc. v. Commissioner,supra;Commodores Point Terminal Corp. v. Commissioner,11 T.C. at 416; S. Rept. No. 627, 78th Cong., 1st Sess. 1944 C.B. 973, 1017. Petitioner argues that the PAC stock was "forced" upon Met Mooney by Todd, that Sondak had always insisted that Met Mooney not purchase it, and that it only did so to obtain the operating licenses (as well as to follow through on the original Van Dyke-Todd agreement).Careful scrutiny of the entire record leads us to conclude that petitioner is correct in his claim that tax avoidance was not Met Mooney's principal purpose for acquiring the PAC stock. In a case such as the instant one where we are required to traverse that maze of subtle facts and nuances that, when assembled, establishes intent, the testimony of the acquiring corporation's top management is significant. Capri, Inc. v. Commissioner,65 T.C. at 179; D'Arcy-MacManus & Masius, Inc. v. Commissioner,63 T.C. at 450. *76 We are not to rely solely on their testimony, however. Though subjective, our inquiry is to be based upon objective facts that indicate what that subjective intent was. Capri, Inc. v. Commissioner,supra.
All persons who testified to this matter, Todd and Herold for the sellers, Van Dyke and Sondak for the buyers, stated that acquiring PAC's net operating losses was never of any significance to their arrangement. All parties stated that the losses were never considered prior to the April 9, 1969 agreement. Van Dyke impressed us as credible, straightforward, and convincing. His interest was to acquire the airport property in order to expand Met Mooney's facilities and to do so at a bargain price. Sondak, a counselor whose advice was very respected and utilized in making Met Mooney's decisions, also claimed that acquisition of the losses was not Met Mooney's principal purpose. The facts support this claim. Sondak was attempting to negotiate a better deal with Herold as late as September 2, 1969 over extra liabilities that the audit had uncovered. If acquiring the losses had been of major importance, we doubt that Sondak would be quibbling over this extra *77 payment since it threatened a deal whereby the net tax benefits could exceed 10 times that amount. [26]
Though we need not concern ourselves with what was Todd's or Herold's intent when the stock was sold, we find their disinterested testimony at trial to be worthy of comment. Todd steadily maintained that it was through his constant insisting that Met Mooney acquired the stock and that the losses were never considered in structuring the Met Mooney deal. Herold corroborated Todd's testimony. Neither of these parties has anything to gain at this point in time from the outcome of this case. Therefore, there is no movitation apparent to us which would cause us to minimize or discredit this testimony.
More importantly, an examination of the surrounding facts supports the statements of all the parties to the transaction. The purchase price for the PAC *78 stock and airport property was set at $736,000. This was to be in the form of $111,000 in cash and a maximum amount of liabilities assumed of $625,000.Met Mooney had to wait until the audit was completed until it could accurately determine the full extent of those liabilities. Todd subsequently worked a dollar for dollar reduction in the price of the airport land in exchange for Met Mooney's acquisition of additional liabilities upon purchase of the stock. [27] This explains why the stock could not be purchased until the audit was completed because only then would Met Mooney know for certain the extent of its exposure to PAC's creditors in order to finalize the deal. Given this factual scenario, it *79 also would have been a poor business move on Met Mooney's part if it had not acquired the PAC stock. Starting on April 9, 1969, Met Mooney was in charge of the Princeton airport operations. Acting for PAC, it performed a significant turnaround in the latter corporation's financial performance, from a $488,403 net loss during the May 31, 1969 fiscal year to a $5,455 loss in 1970 (partly while Todd was still the stockholder) to a profit the next year. If Met Mooney had not purchased the PAC stock, such a reduction would have occurred between April 9 and the purchase date, and therefore Todd would have had the advantage of Met Mooney's services. That alone may be sufficient to determine that Met Mooney possessed a dominant business purpose.See Kershaw Mfg. Co., Inc. v. Commissioner,T.C. Memo. 1965-44. But more importantly, the fact that Met Mooney did not plan against this possibility while it operated PAC is further evidence that Met Mooney always anticipated obtaining the PAC stock in response to Todd's insistence.[28] In short, the weight of the evidence points to the conclusion that Met Mooney struck a deal based upon good business purposes and simply followed *80 through on that original plan. We see no reason why becoming aware of the tax benefits arising from that plan should now disqualify the buyer's claim to them. Cf. Hawaiian Trust Co., Ltd. v. United States,supra.[29]
In addition, even when focusing solely on the September 23, 1969 date, there still are sufficient reasons to conclude that the PAC stock was acquired principally as the result of a bona fide business purpose. In acquiring the PAC stock, Met Mooney avoided having to cease operations for 2 to 3 weeks until it could be issued licenses in its own right. The licenses could not be purchased separately from the PAC stock. No businessman wishes to be forced *81 out of business for any time, let alone 2 or 3 weeks. These licenses were therefore valuable to Met Mooney. That they could be acquired for only one dollar strikes us as a very good business deal. Therefore, acquiring the stock was the only or most feasible way of structuring the transaction. In given cases, such a finding has been sufficient to place the transaction outside the scope of section 269. Hawaiian Trust Co., Ltd. v. United States,supra;Glen Raven Mills, Inc. v. Commissioner,59 T.C. 1 (1972); Clarksdale Rubber Co. v. Commissioner,45 T.C. 234 (1965); Baton Rouge Supply Co. v. Commissioner,supra.
We conclude that when all the surrounding facts and circumstances are considered, Met Mooney's principal purpose for acquiring the PAC stock was not tax avoidance or evasion. Thus, section 269 does not apply. Issue 2. Section 382
While section 269 is not applicable, we must still decide whether the benefit of the losses is disallowed under section 382. [30]Section 1.269-6, Income Tax Regs.
*82 Section 382 provides for the elimination of the net operating loss carryovers of a corporation if a qualifying change in the ownership of the stock of the corporation is accompanied by the failure of that corporation to continue carrying on substantially the same trade or business as it conducted before such change in ownership. The test of whether the corporation is carrying on substantially the same business is applied at the close of the taxable year of the acquisition and the subsequent taxable year. See footnote 30, supra. See also section 1.382(a)-(1)(a), Income Tax Regs. Neither party contests whether there was the required change of ownership. Therefore, the only question to be resolved is whether PAC carried on substantially the same business under section 382(a)(1)(C). Respondent claims that section 382 applies because petitioner's air taxi service was its primary business and the disposition of it just before the granting of the stock option was at the behest of or on behalf of Met Mooney. [31] Petitioner claims that no such plan or agreement existed between Todd and Met Mooney; and in the alternative, petitioner claims it carried on substantially the same trade *83 or business as previous to the change in ownership.We hold for petitioner. Section 382 by its terms does not require a corporation to continue exactly the same treade or business. "It would seem there could be some changes in the manner of conducting [the] trade or business and yet the business could remain 'substantially the same.'" Goodwyn Crockery Co. v. Commissioner,37 T.C. 355, 362 (1961), affd. 315 F.2d 110 (6th Cir. 1963). On the other hand, the regulations and the legislative history state that the discontinuance of any except a minor portion *84 of the taxpayer's business may constitute the necessary change in a trade or business. Section 1.382(a)-1(h)(7), Income Tax Regs.; S. Rept. No. 1622, 83d Cong., 2d Sess., 285 (1954). Respondent bases his argument on the contention that PAC's major business was operating the air taxi service. He claims that when PAC leased out these rights at the behest of Met Mooney and later discontinued service when Suburban quit the lease, PAC was changing its business to one of aircraft sales. Petitioner concedes that the air taxi service was discontinued in 1969, [32] but states that all other operations of PAC remained practically identical. Therefore, it claims that its business remained substantially the same as it was before its acquisition: that of a fixed base airport facility. Unlike section *85 269, the test under section 382(a) is an objective one with specific factors to be considered along with any other relevant item in determining whether a corporation has changed its business. Section 1.382(a)-1(h)(5), Income Tax Regs., provides as follows: In determining whether a corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock, all the facts and circumstances of the particular case shall be taken into account.Among the relevant factors to be taken into account are changes in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise. These factors shall be evaluated in the light of the general objective of section 382(a) to disallow net operating loss carryovers where there is a purchase of the stock of a corporation and its loss carryovers are used to offset gains of a business unrelated to that which produced the losses. However, the prohibited utilization of net operating loss carryovers to offset gains of a business unrelated *86 to that which produced the losses is not dependent upon considerations of purpose, motive, or intent, but rather is established by the objective facts of the particular case. The principles set forth in this subparagraph shall be applied in accordance with the rules set forth in the following subpartagraphs of this paragraph. [Emphasis supplied.] We think respondent here applies too narrow an interpretation as to what constitutes substantially the same business under section 382(a)(1)(C). Of the relevant facts we must consider, PAC's location, plant, employees, and equipment were all virtually identical to those before acquisition. [33] PAC retained the same customers as before, though Met Mooney brought in new ones. There was no change in product (airplanes), only the brand and model sold were changed. Consequently, we think the factors set out in section 1.382(a)-1(h)(5), Income Tax Regs., when applied to the instant case, show that PAC continued to conduct substantially the same trade or business as it previously did. In *87 H.F. Ramsey Co. v. Commissioner,43 T.C. 500 (1965) we reviewed the legislative history of section 382 and concluded that "it would appear that there has to be a real change in the type of business conducted to come within [the] statute." 43 T.C. at 514 (emphasis supplied). Accord, Goodwyn Crockery Co. v. Commissioner,supra;Clarksdale Rubber Co. v. Commissioner,45 T.C. 234 (1965). Both before and after the acquisition, PAC's operations are best described as a fixed base airport operation. The type of business did not change. PAC still sold and leased planes to qualified pilots, had a charter service, a hangar and tie down service, sold parts and fuel, conducted aircraft maintenance and ran a flight school possessing V.A. approval. We conclude that it operated substantially the same type of business both before and after the sale of its stock. Respondent nevertheless claims that the air taxi service was the "major" portion of PAC's business and that this was discontinued in favor of increasing sales. Such was not the case. First, respondent bases his argument on the rapid rise in sales revenue *88 in 1971 through 1973. However, respondent confuses "revenue" with "income." The larger numbers are attributable to the fact that PAC began selling larger planes after its acquisition than it did before. The base retrail price for these models exceeded by 6 times the maximum price of the models PAC was selling previously.Therefore, while we agree that much greater vigor was placed on sales, we cannot conclude the business activities (meaning in this context the number of planes sold) were so significantly different as to warrant application of section 382(a)(1)(C). In addition, it is clear that increasing or augmenting an existing and vital business (here, the sales activities) by itself does not constitute a change of business under section 382(a)(1)(C). See B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 16.22, p. 16-63 (4th ed.). Second, even accepting the gross revenue figures as a strong indicator of business activity, respondent is incorrect in his claim that the air taxi service was PAC's "principal business activity" and the "major portion of its business." In 1968, the last full fiscal year prior to Met Mooney's takeover of PAC's *89 operation, the stipulation states that receipts from aircraft sales totalled 42.5 percent of PAC's gross revenue while the air taxi service accounted for 31.9 percent. Hence, the figures agreed to by respondent point out that 68.1 percent of revenue was not attributable to the air taxi service, and, both before and after acquisition, sales--not merely the air taxi service--continued to be the major portion of petitioner's business. Respondent also relies upon section 1.382(a)-1(h)(7), Income Tax Regs. That regulation states that if a corporation discontinues more than a minor portion of its business carried on before the change in ownership, it has not continued to carry on substantially the same trade or business. The regulation goes on state, however, that in determining whether the discontinued activities are more than "minor" for purposes of that regulation: consideration shall be given to whether the discontinuance of the activities has the effect of utilizing loss carry-overs to offset gains of a business unrelated to that which produced the losses. [Enphasis supplied.] It is clear from the language of the regulation that consideration must be given to whether *90 the losses have been utilized in an unrelated business. In this situation, an "unrelated business" is one where the economic endeavor is different from that which gave rise to the losses. Coast QualityConstruction Corp. v. United States,463 F.2d 503 (5th Cir. 1972). Such is not the case here. As stated earlier, respondent draws too narrow an interpretation of petitioner's activities. Generally, we are not of the opinion that they should be segmented as respondent has done. If we were to do so, however, we think that petitioner's fixed based airport operation is separable into two businesses: services and sales. A review of the revenue figures show that the air taxi service was only a portion of the "service" component.PAC continued to rent and charter airplanes and provided maintenance and hanger services. In terms of section 1.382(a)-1(h)(7) of the regulations, this is not a different "economic endeavor" than what PAC was previously engaged in. Coast Quality Construction Corp. v. United States,supra.[34] Accordingly, respondent has not succeeded in demonstrating that there was a significant change in the petitioner's business and we do *91 not think the statute was intended to reach to cases such as the present one. Cf. Glen Raven Mills, Inc. v. Commissioner,59 T.C. 1 (1972). [35]
In view of our resolution of the issues herein, Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all references to sections shall be to the Internal Revenue Code of 1954, as amended and in effect in 1969.↩
*. (Less than one-hundreth percent.)↩
2. The actual amount was 50.001 acres. ↩
3. The property was later reconveyed on April 9, 1969 to Todd and his wife in exchange for one dollar. At that time Todd and his wife owned all the stock of DeForest Realty. The parties presented no evidence as to how this retransfer of the land was characterized for tax purposes.↩
4. To distinguish it from the other air services that PAC provided, occassionally the scheduled commuter air carrier service will be referred to as the air taxi service.↩
5. At one time, flights also went to La Guardia Airport in New York.↩
6. Though on a fully allocated basis the air taxi service was never profitable, it provided the bulk of the cash flow for the corporation.↩
7. Todd was also willing to merge interests or acquire other operations and consolidate services.↩
8. This refers to the geographic area of the East Coast of the United States stretching approximately from Washington, D.C. to Boston, Massachussets.↩
9. The airports investigated included Kobelt Airport in Wallkill, New York; Towaco Airport in Montville, New Jersey (which was eventually acquired); Orange County Airport; and Stewart Air Force Base in New York.↩
10. The exact date of the deal is unknown but was around March 24, 1969.↩
11. These liabilities were ultimately forgiven or assumed by Todd.However, respondent does not assert that these represent cancellation of indebtedness or other income to petitioner. See United States v. Kirby Lumber Co.,284 U.S. 1 (1931); Old Colony Trust Co. v. Commissioner,279 U.S. 716↩ (1929); section 61(a). Because it has not been so asserted and the record is otherwise insufficient to make a determination, we need not address this issue.
12. Therefore, the price of the properties and stock would total a maximum of $736,000 ($625,000 liability assumption plus $111,000 cash).↩
13. Though the original date for termination of the option as stated in the written agreement was May 15, 1969, it is clear that the parties intended the option to continue until the audit could be performed.↩
14. The parties do not definitely state whose "assets" are referred to. We assume these were assets of the corporation only.↩
*. These adjustments were necessary because, as stated earlier, PAC's liabilities had exceeded previous estimates and Met Mooney would only assume up to $625,000 on all the properties.↩
15. The stipulation states that "petitioner," rather than Todd, entered into the agreement with Van Dyke on behalf of Met Mooney for the stock purchase. This is contrary to the record, as Todd owned all of the stock of petitioner at that time and it was he who originally granted the option to Mooney. Todd had previously acquired all the PAC shares from Tokash and the remaining shareholders for no consideration.↩
16. In addition to Sales and Service items, petitioner had the following miscellaneous income: Year
Amount
1968
$3,257
1969
9,174
1970
2,259
1971
846
1972
17,533
1973
1,589
The quick increase in sales volume in the years 1971-73 is attributable to the fact that Met Mooney began to market a new Mitsubishi turbo prop with a price between $300,000 and $600,000. The maximum price of the planes they previously sold was $50,000. Therefore, achieving the same revenue on the sale of one turbo prop would require selling from 6 to 12 of the previous models.↩
17. It appears that Todd's inferences regarding his political possibilities were correct. After the sale, Todd immediately became Special Assistant to the Chairman of the Civil Aeronotics Board. Subsequently, he served as Deputy Special Assistant to the President as a member of the White House Staff, Inspector General of Foreign Assistance for the State Department, Chairman of the National Transportation Safety Board, Director of Engineering and Air Safety for the Airline Pilots Association, and is presently Vice-President for Corporate Development for the parent company of Frontier Airlines.↩
18. The information on the scratch sheet appeared as follows: Losses
Avail for C/F
5/31/64
$1,043.44
1970
5/31/65
17,436.45
$ 17,436,45
1971
5/31/66
11,978.81
11,978.81
1972
5/31/67
94,670.74
94,670.74
1973
5/31/68
224,591.43
224,591.43
1974
5/31/69 EST The term "EST" indicates the sheet was prepared before the audit was concluded.
*↩
245,000.00
245,000.00
$593,637.43 [sic]
19. Hulse was unavailable to testify because he died prior to trial.↩
20. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX (a) IN GENERAL.--If-- (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * * (c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.-- The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate-- (1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), * * *; and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not avialable to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.↩
21. Note that the 30,000 shares of Commuter Airline stock to be paid by Suburban was to go to Todd personally, as he was the then-present owner of the PAC stock.↩
22. Congress apparently agreed, and repealed section 269(c) pertaining to all transactions entered into after October 4, 1976. Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520. See Joint Committee on Taxation, 94th Cong., 2d Sess. (1976), General Explanation of the Tax Reform Act of 1976, 1976-3 (Vol. 2) C.B. 1, 488; where the Committee stated: This presumption seems to be contrary to the purpose of the provision; i.e., usually tax avoidance motives would be more apt to be present where the value of 'tax benefits' was paid for, than they would be where the 'tax benefits' were not given weight. However, the repeal of section 269(c)↩ was prospective only and therefore warrants our present consideration.
23. The presence of the option (whether oral or written) draws into question as of what time we should determine Met Mooney's principal purpose. This is important because post-acquisition motives of taxpayers have been held to be irrelevant in determining section 269's applicability. Hawaiian Trust Co. v. United States,291 F.2d 761 (9th Cir. 1961). See Capri, Inc. v. Commissioner,65 T.C. 162, 175-179 (1975). Section 269 does not directly state what point in time we should look toward. But due to our finding, infra, that Met Mooney had a valid business purpose for acquiring the PAC stock at both the acquisition of the option and at what would be its exercise date, we need not decide this question. See Kershaw Mfg. Co. v. Commissioner,T.C. Memo. 1965-44↩.
24. All references to rules are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. ↩
25. However, see text on page 24, supra.↩
26. In addition, although Sondak knew little about tax matters, he was in constant contact with Van Dyke. If obtaining the benefit of the losses was of a principal concern, it would have been quite easy for Hulse or Van Dyke to inform Sondack of their intentions or to direct him to keep from interfering. Such did not occur.↩
27. Also, the purpose of section 269 was a response by Congress to prevent taxpayers from trafficking in loss corporations. Because the discovery of additional PAC liabilities worked a reduction in the price of the airport property when it was already at a bargain level, it appears contradictory for us to conclude that Met Mooney was paying for any net operating losses. See footnote 22, supra;H.F. Ramsey Co. v. Commissioner,43 T.C. 500, 516↩ (1965).
28. We have previously held that a seller's insistence to purchase the stock as a prerequisite to a deal constitutes a sufficient business purpose to render section 269 inapplicable. Baton Rouge Supply Co. v. Commissioner,36 T.C. 1↩ (1961). 29. We are not holding that such awareness would be irrelevant to the application of section 269 in all cases. In appropriate circumstances, such as increasing the stock price to additionally compensate the seller, section 269↩ may apply.
30. 382.SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) PURCHASE OF A CORPORATION AND CHANGE IN ITS TRADE OR BUSINESS.-- (1) IN GENERAL.--If, at the end of a taxable year of a corporation-- (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at-- (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to-- (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, [and] * * * (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.↩
31. Section 1.382(a)-1(h)(3), Income Tax Regs: (3) A change in the trade or business of a corporation made in contemplation of a change in stock ownership will be treated as if such change in trade or business had occurred after such change in stock ownership. For example, if a loss corporation changes its business as part of a plan initiated by, or on behalf of, prospective buyers of the loss corporation's stock who wish to avoid the provisions of section 382(a), a subsequent sale of stock to such buyers will cause the change in business to be treated as if it had occurred after the sale.↩
32. Section 1.382(a)-1(a)(2)(ii), Income Tax Regs.↩, states that stock acquired by option will be considered acquired as of the date of the option's acquisition. The determination of what is the trade or business would therefore be done as of that date. Because the air taxi service was subleased prior to the granting of the option, however, we need not concern ourselves with this issue.
33. Though some PAC employees were released because of the discontinuance of the taxi service, we find this number (if relevant) to be minor.↩
34. Carried further, respondent's argument necessitates that we isolate the losses in a business to those assets or activities which gave rise to them. The Fifth Circuit Court of Appeals specifically rejected this "loss-follows-asset" theory in Coast Quality.↩
35. If we had held that PAC's business was not the same, in order for respondent to prevail, we still would have to determine that the sale of the air taxi service was in contempation of the Met Mooney deal. Sec. 1.382(a)-1(h)(3), Income Tax Regs.↩ All parties involved in the PAC acquisition testified that the disposition of the air taxi service was not done in contemplation of the sale to Met Mooney. In light of our holding above, though, we need not decide this issue.